**Eddie James JOHNSON, Appellant,**

v.

**The STATE of Texas, Appellee.**

No. 70999.

Court of Criminal Appeals of Texas,
En Banc.

Oct. 13, 1993.

Rehearing Denied Dec. 8, 1993.

Certiorari Denied April 18, 1994.

See 114 S.Ct. 1579.

Carl E. Lewis, Corpus Christi, for appellant.

Thomas L. Bridges, Dist. Atty. and Michael E. Welborn and Patrick L. Flanigan, Asst. Dist. Attys., Sinton, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

WHITE, Judge.

Appellant was convicted of the offense of murder committed in the course of kidnapping. See TEX.PENAL CODE ANN. § 19.-03(a)(2). This offense originated in Aransas County, where appellant was indicted and assigned Cause No. 2223. On July 26, 1988, pursuant to appellant's motion, venue was changed to Victoria County. On September 11, 1989, pursuant to appellant's motion, venue was then changed to Bee County. After the jury affirmatively answered both of the special issues submitted to them, the trial court assessed appellant's punishment at death. TEX.CODE CRIM.PROC.ANN. Art. 37.071(b)(1) & (2). Direct appeal to the this Court is automatic. Art. 37.071(h). We will affirm the judgment of the trial court.

In seven points of error, appellant argues the trial court erred in: denying his motion to suppress evidence seized during a search of his trailer; admitting evidence seized as a result of an illegal search of his trailer; admitting evidence of analysis of blood taken from him pursuant to a search warrant as the affidavit in the search warrant contains no probable cause to support issuance of the warrant; in admitting evidence seized pursuant to a search warrant which was overbroad in authorizing seizure of his blood where the affidavit presented to the magistrate provided no probable cause for seizure of blood; in admitting evidence seized pursuant to a search warrant where there was no probable cause for the issuance of the search warrant and there was no showing of a good faith exception to the requirement for a validly issued search warrant; and, in overruling his motion for mistrial after the State made a patently improper argument before the jury at the close of the punishment phase of the evidence. Appellant also contends that the jury's verdict in convicting him of the offense of capital murder was not supported by the evidence in that the evidence presented at the trial was insufficient to show his guilt beyond a reasonable doubt.

The crime spree involved in the instant case actually resulted in two charges of capital murder against appellant.[1] The first, which was assigned Cause No. 2222 in Aransas County, was addressed on direct appeal by this court in *Johnson v. State*, 803 S.W.2d 272 (Tex.Cr.App.1990). For simplicity sake, we will refer to this as "appellant's first capital murder conviction" throughout this opinion. Although two separate trials were held, pre-trial motions for both cases, Cause No. 2222 and No. 2223, were combined and resolved in Aransas County. The same motion to suppress and arguments were presented by appellant in both cases.

When the instant trial was convened in Bee County, the trial court, pursuant to appellant's request, accepted into evidence the transcript and evidence of the combined pre-trial hearing in Aransas County. There was

---

1. In appellant's first capital murder conviction, he was tried for murdering more than one person during the same criminal transaction. See TEX.PENAL CODE ANN. § 19.03(a)(6)(A). Appellant was indicted, tried, and convicted for the murders of Virginia Cadena and Elizabeth Galvan. *Johnson v. State*, 803 S.W.2d, n. 1, at 276. Even though David Magee, the victim in the instant case, was murdered along with Cadena and Galvan in the same transaction, his murder was the subject of the instant, separate indictment.

no further evidence or argument offered by appellant or the State. The trial court in the instant case then issued the same ruling as did the trial court in appellant's first capital murder conviction.

In this Court's opinion in appellant's first capital murder conviction, we addressed the several arguments which appellant makes in the instant case involving pre-trial rulings. Since the same evidence, arguments, and rulings are involved, we find *Johnson,* supra, dispositive of points of error one through five.

In point of error one, appellant argues that the trial court erred in denying his motion to suppress evidence seized during a search of his trailer where the State showed neither voluntary consent nor a validly issued search warrant. Specifically, appellant contends that the consent to search given by his wife was not freely and voluntarily given.

This argument corresponds with point of error three in appellant's first capital murder conviction. *Johnson v. State,* 803 S.W.2d 272, at 285. Having already addressed this argument in appellant's first capital murder conviction and found that the record was sufficient to support the trial court's finding that consent was freely and voluntarily given, we will defer to our prior holding. *Johnson,* supra, at 287. Point of error one is therefore overruled.

In point of error two, appellant alleges that the trial court erred in admitting evidence seized as a result of an illegal search of his trailer. Specifically, he argues that since the consent to search the trailer was not freely and voluntarily given (see point of error one, supra), a boot with blood stains that was recovered during the search and related testimony should have been suppressed.

We held in point of error one, supra, that the record supported the trial court's finding that consent to search the trailer was freely and voluntarily given. Absent any other argument urged by appellant, we find that the admission of evidence discovered as a result of that search was proper. Point of error two is overruled.

By way of point of error three, appellant contends that the trial court erred in admit-

ting evidence of analysis of blood taken from his person pursuant to a search warrant. The warrant authorized seizure of his blood, hair or saliva. He argues that the affidavit in the warrant contained no probable cause to support issuance of this warrant. In his fourth point of error, appellant asserts that the same search warrant was overbroad in authorizing seizure of his blood because the affidavit provided no probable cause for the seizure of blood.

These points of error are a revisitation of points of error four and five, respectively, in appellant's first capital murder conviction. *Johnson v. State,* 803 S.W.2d 272, at 287–89. Our prior opinion contained a lengthy discussion of the probable cause necessary to support a search warrant. *Id.,* at 288–289. Applying the standard to the one sub judice, we find that the affidavit underlying the search warrant involved in the instant case contained sufficient probable cause to support issuance of the warrant. See *Id.,* at 289. Additionally, we find that the affidavit did supply probable cause for the seizure of appellant's blood. See *Id.,* at 289.

Appellant's argument in points of error three and four are identical to those we have already addressed. *Johnson v. State,* 803 S.W.2d 272, at 287–89. Moreover, they involve the same search warrant. *Id.* Finding no reason to depart from our prior holdings, we overrule points of error three and four.

Appellant argues in his fifth point of error that the trial court erred in admitting evidence seized pursuant to a search warrant where there was no probable cause for the issuance of the search warrant. Additionally, he argues that there was no showing of a "good faith" exception to the requirement for a validly issued search warrant. Appellant asserts that the magistrate wholly abandoned his judicial role in making his probable cause determination. This is the same search warrant addressed in points of error three and four.

This argument is the same as that raised in point of error six in appellant's first capital murder conviction. *Johnson v. State,* 803 S.W.2d 272, at 289. When we previously addressed this argument, we found that the

search warrant was validly issued based on probable cause. As such, we held that the magistrate did not abandon his judicial role and no showing of a good faith exception was required. Since appellant urges the identical argument, we are compelled to overrule point of error five.

In his seventh point of error, appellant claims the jury's guilty verdict "was not supported by the evidence in that the evidence presented at the trial was insufficient to show appellant's guilt beyond a reasonable doubt." Appellant argues that this Court should not consider the evidence discovered during the search of his trailer because it was illegally seized. See points of error one through five, *infra.*

■■■ Even if this evidence was inadmissible, and the trial court erred in permitting its admission, we would still consider it in conducting our review of the sufficiency of the evidence. In *Thomas v. State,* 753 S.W.2d 688, at 695 (Tex.Cr.App.1988), this Court stated, "In assessing the sufficiency of the evidence to support a conviction, a reviewing court must consider all evidence which the jury was permitted, whether rightly or wrongly, to consider. *Beltran v. State,* 728 S.W.2d 382, 389 (Tex.Cr.App.1987); *Porier v. State,* 662 S.W.2d 602, 605–606 (Tex.Cr.App. 1984) . . ." See, also, *Chambers v. State,* 805 S.W.2d 459, at 460 (Tex.Cr.App.1991); *Faulder v. State,* 745 S.W.2d 327, at 330 (Tex.Cr.App.1987); and *Dunn v. State,* 721 S.W.2d 325, at 327 (Tex.Cr.App.1986). This Court explained the rule:

> "In the event a portion of this evidence was erroneously admitted, the accused may complain on appeal of such error. If his complaint has merit and the error is reversible, see Rule 81(b)(2), Tex.R.App. Proc., a new trial should be ordered. **But jurors do not act irrationally taking such evidence into account,** since they are bound to receive the law from the trial judge. All evidence which the trial judge has ruled admissible may therefore be weighed and considered by the jury, and a reviewing court is obliged to assess the

jury's factual findings from this perspective." (emphasis added).

*Thomas v. State,* 753 S.W.2d, at 695. Regardless of the legality of the search of appellant's trailer, we shall consider all of the evidence admitted at trial to determine if it was sufficient.

■■■ Appellant correctly points out that the evidence at trial was circumstantial. Circumstantial evidence should not be tested by an ultimate standard for review different from direct evidence. *Butler v. State,* 769 S.W.2d 234 (Tex.Cr.App.1989); *Carlsen v. State,* 654 S.W.2d 444, at 448–449 (Tex.Cr. App.1983). In reviewing the evidence, we must look at it in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Butler v. State,* 769 S.W.2d, at 238. Since the State relied on circumstantial evidence in the instant case, we will use the "exclusion of reasonable hypotheses" approach as the *method* of analyzing the sufficiency of the evidence. (emphasis added). *Garrett v. State,* 682 S.W.2d 301 (Tex.Cr.App. 1984); *Butler v. State,* supra, at fn. 1.[2] Also, it is not necessary that every fact point directly and independently to the defendant's guilt; it is enough if the conclusion is warranted by the combined and cumulative force of all the incriminating circumstances. *Russell v. State,* 665 S.W.2d 771, 776 (Tex.Cr. App.1983).

We will therefore begin by addressing the evidence presented at trial. In a normal sufficiency review of a case built on circumstantial evidence, we would then consider appellant's proposed alternative hypotheses. However, in the instant case, appellant has failed to argue in his brief on appeal any alternative hypotheses before this Court. At trial, he presented the theory that appellant was home with his stepson at the time of the instant offense. He also contended that the victim, Magee, was a drug user, and implied that the murder of the victim by an unknown

---

**2.** The instant cause was tried prior to this Court's decision in *Geesa v. State,* 820 S.W.2d 154 (Tex. Cr.App.1991).

assailant was somehow drug-related. These trial hypotheses are the ones we shall consider in the instant case.

In the early morning hours of September 29, 1987, Deputy Sheriff Jerry Hutson discovered the body of an Hispanic female near Johnson Road in Aransas County. This woman was later identified as Virginia Cadena. She appeared to have been dragged down the road. When D.P.S. Trooper Stephen Miller arrived at the scene, he noticed that Cadena had suffered gunshot wounds to her head. Deputy Sheriff William Spaulding went to the scene in response to Deputy Hutson's call for assistance. When Spaulding got there, he discovered the bodies of an Anglo male and a young Hispanic girl a short distance from the body of Cadena. The young girl was later identified as Cadena's ten-year old daughter, Elizabeth Galvan.

The man was identified as David Magee, who had lived with Cadena and Galvan for several years. Magee's feet were bound together with a strand of electrical stereo wire. Magee's hands were tied behind his back with a long electrical cord from a telephone. Neither Galvan or Cadena were bound.

Dr. Joseph Rupp, Medical Examiner for Nueces County, performed autopsies on the three bodies. According to Rupp, Magee died as a result of a gunshot wound to the head, inflicted by a large calibre handgun, a .32 calibre or larger. Magee had also suffered other gunshot wounds. A drug screen on Magee's body revealed the presence of cocaine and heroin in Magee's system. Rupp observed needle tracks on Magee, with a "good, thick needle track" in the crook of his right arm and faint needle tracks on his right forearm.

Rupp explained that Cadena also died from large calibre gunshot wounds to the head, similar to those suffered by Magee. Cadena also showed significant lacerations, abrasions and contusions, apparently from being run over. Galvan died as a result of multiple gunshot wounds to the abdomen, inflicted by a .25 calibre weapon.

Captain Dean Smith of the Aransas County Sheriff's Department supervised the investigation into the deaths of Magee, Cadena and Galvan. After they finished at the Johnson Road scene, Smith and the other officers continued their investigation at 118 Jackson Square Apartments, the residence shared by Magee, Cadena and Galvan. Their apartment appeared to have been the scene of a bloody struggle. The officers found: electrical wire from a stereo similar to that used to bind Magee's feet, a spent .38 calibre bullet, a Budweiser can with appellant's fingerprints on it, and a telephone with appellant's fingerprints on it whose cord had been removed. The blood found in the apartment was determined to have come from Magee.

Employees of the Aransas Pass Nursing Home discovered Cadena's car in the parking lot of the nursing home on the morning after the murders. The nursing home is approximately two blocks from appellant's trailer home in the Portobello Village Trailer Park. Investigating officers discovered blood in the interior of Cadena's car. Several pieces of skin tissue and hair, found underneath Cadena's car "from the front bumper to the rear bumper," were found to have come from Cadena. This indicated that Cadena had been struck and dragged beneath the car. Officers also found "some bloody Coke cans" inside the car, including one between the driver's seat and the console. A palm print on this can was determined to have been made by appellant. Officers found "several bullet holes in the car," along with six .25 calibre semi-automatic shell casings. Officers also found two large calibre lead projectiles in the car. In addition, officers saw blood spots on the ground in the parking lot leading from the car in the direction of the Portobello Village Trailer Park where appellant lived.

On the roof of the nursing home, the officers found a blood-soaked towel. Anita Kay, an employee of the nursing home, found a bloody Budweiser can, some bloody socks and some blood-soaked rags on the grounds of the nursing home in the parking lot before the officers arrived. She threw them into a dumpster, where she later told the officers they could retrieve them.

Pam Meiselbach worked with Cadena at a convenience store in Aransas Pass. When Meiselbach learned that Magee, Cadena and

Galvan had been murdered, she contacted the police on September 29, the day after the murders. Meiselbach told the officers about her perception that appellant had a bad relationship with Magee and Cadena. She also told the police that she believed appellant was responsible for the murders.[3] Meiselbach testified that appellant and Cadena had "feisty confrontations," and were upset and angry with each other. Meiselbach had also observed hostile confrontations between appellant and Cadena regarding Magee, where appellant told Cadena, "You better tell your old man or husband to shut his mouth and you too" and "Well, you don't think I'll do nothing, but I will."

When the police went to the trailer park where appellant lived, they looked through the trash dumpsters. When the police looked through the dumpster near appellant's trailer, they found a pair of Wrangler blue jeans and a pair of underwear. Both the jeans and underwear were bloody and soaking wet when the officers found them.

At trial, Stephen Hoskins, manager of the trailer park, testified that he saw appellant arrive home after 6:00 in a taxicab on September 29. Hoskins observed appellant go inside his trailer and, approximately ten to fifteen minutes later, come out and go to the dumpster with a bag of trash. Hoskins remarked this was unusual, since appellant's stepson usually took out the trash.

On the late evening of September 29, the police obtained a warrant for the arrest of appellant. Officers surrounded his trailer home at the Portobello Village Trailer Park. Appellant and his stepson, Michael, were the only people in the trailer. Appellant complied with the officers' order to come out of his trailer. The officers then arrested appellant. The police transported appellant and Michael to the police station. At the time of his arrest, appellant had a cut between the thumb and index finger of his right hand. At trial, through the testimony of defense witness Randy Wright, the State showed this cut was consistent with the type of cut that can be caused by the slide recoil of a .25 calibre semi-automatic pistol, such as the one used in the murder of Galvan.

On October 1, appellant's wife, Elaine Johnson, gave her consent to the search of her and appellant's trailer. Officers searched the trailer on October 1 and found a pair of appellant's work boots which were splattered with human blood. The police also seized a gun cleaning kit suitable for a .38 calibre pistol and a gun cleaning kit suitable for a .25 calibre pistol from appellant's trailer. They also found an empty holster with the initials "J.R." underneath the vacant trailer next to appellant's trailer.

Jerry Ramsey later identified the monogrammed holster as belonging to him. It was the holster to his .38 calibre Colt snubnosed detective special. Ramsey explained that the gun and holster had been stolen from his vehicle at work several weeks before the murders. The police investigated the theft on September 7.

At trial, the State proved that appellant had possession of the .25 calibre weapon used to kill Galvan. Arturo Riojas testified that he owned a .25 calibre semi-automatic pistol which had been stolen from his residence around April 8, 1987. Gilbert Davilla, Riojas' stepson, testified that he took Riojas' .25 calibre pistol from Riojas' home. Davilla then gave the pistol to Dionicio Pena to sell. Pena testified that he sold the .25 calibre pistol to appellant.

On October 16, Velma Jackson found the .25 calibre pistol near a roadway close to where the bodies of Magee, Cadena and Galvan were found. Jackson and her husband had stopped to fix their car when her husband told her to find a piece of lumber to brace the front wheels of their car. When she went to pick up the lumber, she saw the pistol. She and her husband retrieved the weapon and turned it over to the Aransas Pass Police Department the next day. They turned the pistol over to Charles Parker, a civilian ballistics expert for the Corpus Christi Police Department, for testing. Par-

3. After this conversation with Meiselbach, the police made appellant their prime suspect in the murders. Until that discussion, Johnny Galvan, Cadena's ex-husband, had been their primary suspect. However, they discovered that Johnny Galvan was at work in Texas City on the night of the murders.

ker testified that he determined that the two bullets removed from Galvan's body had been fired from the .25 calibre pistol submitted to him by the Aransas Pass police. Parker also determined that the six shell casings recovered from the back seat of Cadena's car were fired from the same pistol. Through comparing the serial numbers of the pistol purchased by Riojas at Wal–Mart, and later by appellant from Pena, and the serial numbers on the pistol tested by Parker, the State proved they were the same weapon.

The State called Patricia Hulen and Roxanna Payne, forensic serologists from the Texas Department of Public Safety, to testify at trial. They testified that the electrical stereo wire used to bind Magee's ankles came from the stereo wire found in the victim's apartment. They testified that the telephone cord used to bind Magee's hands had been stretched and pulled away from its source. The victim's telephone, which had appellant's fingerprints on it, had a modular jack on it. The wall connection for the phone was also a modular jack. Both jacks showed signs that the telephone wire had been jerked out of the jacks. The ends of the telephone cord had been so stretched and distorted that there was "no common point of comparison," as there had been with the stereo wire.

The State's experts testified that Magee's blood was found on the following items and in the following places: the blood stains in the carpet and on the bedspread of the victim's apartment; the blood stains on the driver's seat and console, and on the floorboard behind the front seat, of Cadena's car; the blood stains on the towel recovered from the top of the nursing home; the blood stains on the jeans recovered from the dumpster in the trailer park where appellant lived; and the blood stains on appellant's work boots. The experts testified that the blood stains from the back seat of Cadena's car were consistent with Galvan's blood. They also explained that the blood stains found underneath Cadena's car and some of the blood stains found on the jeans recovered from the dumpster were consistent with Cadena's blood. They testified that the hairs recovered from the jeans found in the dumpster were consistent with the head hair of Cadena.

Diana Leucht, a former co-worker with appellant and Magee, testified that appellant developed a serious grudge against Magee. Appellant had been working as a "yard man" at Grasso Oilfield Services for several months before Magee was hired as "yard foreman." Appellant repeatedly refused to follow Magee's orders and made threats to "get even with Magee." Approximately one month after Magee was hired, appellant was fired, because he had "bugged" Leucht's office and had yanked a cabinet away from the wall and thrown it to the side.

Johnny Goff testified that on September 28, the day of the murders, he picked up appellant at his trailer in Goff's taxicab at 6:30 p.m. Goff took appellant to a convenience store across the street from the Jackson Square Apartments where the victims lived. Appellant was wearing a "pretty new" pair of blue jeans at that time. Appellant asked Goff if he could pay him later for the cab fare. Goff agreed. When Goff saw appellant on September 29, the next day, appellant paid him for both the September 28 fare and for another that appellant owed Goff.

Appellant called twelve witnesses in his defense. His stepson, Michael, testified that appellant left their trailer on September 28 around 6:00 p.m. and returned at "roughly around" 9:00/9:30. Michael said that appellant watched CNN news and talked with him before going to bed about "10:30/11:00/11:30." Michael stated that he stayed and watched TV for a while before going to sleep on the couch. He did not see appellant again until the next morning. On cross-examination Michael admitted there was a back door to the trailer. Michael explained that someone could come in or go out that door without being see by someone on the couch.

Michael testified that appellant owned a .25 calibre handgun. He said that the gun examined by Charles Parker was a "little like" the one that appellant owned. On redirect, he denied that they were the same weapon.

Jerry Rogers testified that at the time of the murders, he was a resident of the Jack-

son Square Apartments. On September 28, at about 10:30 p.m., Rogers heard what sounded to him like a gunshot coming from the direction of the victims' apartment. Rogers went to the phone, which was beside his living room window. From that window, he could see the victims' apartment. After calling the police department to report what he heard, he stood at the window "for quite some time and looked out." He then went back to watching TV, and then to bed. But he went back to the window several times "just looking out and seeing if there was anything to see." He testified that he saw nothing unusual around the victims' apartment. The police never responded to his phone call.

Mike Truesdale and Laura Gilreath testified they were in the parking lot of the Jackson Square Apartments from 7:00 to 10:00 p.m. on the night of September 28. They saw a truck, which they had not seen in the complex before, come into the parking lot three times and leave. Gilreath believed the truck's three Hispanic occupants were watching in the direction of the victims' apartment.

Wade Echols worked with Magee at the time of the murders. He testified that a few days before the murders, Magee asked to use a company truck to drive to Corpus Christi to pay his child support. When he returned at 3:00 p.m., he acted "kind of like he was scared or bothered about something." Then, Magee left early. On the day of the murders, Echols noticed that $100.00 was missing from the office. Magee had been the yard foreman on duty, so Echols called him to find out what Magee knew about the missing $100.00. Magee told him that they would talk about it in the morning.

■ Even though the State's case consists only of circumstantial evidence, we find, after reviewing the evidence in the light most favorable to the verdict, the State presented sufficient evidence at trial for any rational trier of fact to have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S., at 319, 99 S.Ct. at 2789; *Butler v. State*, 769 S.W.2d, at 238.

The evidence at trial showed that appellant had a hostile relationship with Magee and Cadena. Leucht testified that appellant threatened Magee while they were at work. Meiselbach testified that appellant was angry with Magee and Cadena, and that appellant threatened Magee and Cadena during an argument with Cadena. On the night of the murders, appellant took a taxicab ride over to the convenience store across the street from Magee's apartment. Magee's blood was found splattered throughout his apartment. The wire used to bind Magee's hands came from his apartment. Magee's telephone, whose wire was probably used to bind Magee's ankles, had appellant's fingerprints on it. A Budweiser can with appellant's fingerprints on it was found in Magee's apartment, where the abduction of Magee took place.

Magee was shot with a large calibre handgun, either a .32 calibre or larger. A spent .38 shell was recovered from inside Magee's apartment. Jerry Ramsey's stolen .38 handgun was carried in a holster which was found underneath a vacant trailer next to appellant's trailer. Ramsey's gun was stolen a few weeks prior to the murders. Galvan, who was killed in the same transaction as Magee, was shot to death with a .25 calibre handgun traced to appellant's possession just prior to the time of the murders. That .25 calibre handgun was found abandoned in a ditch by a road near the place where the bodies of the three victims were dumped. The .38 calibre handgun was never found.

Magee's blood was found on the driver's seat and console, and on the floorboard behind the front seat, of Cadena's car. A bloody Coke can with appellant's palm print on it was found between the driver's seat and console. A towel with Magee's blood on it was found discarded on the roof of the nursing home where Cadena's car was abandoned. A trail of blood spots from Cadena's car led in the direction of the trailer park where appellant lived, which was near the nursing home. Magee's blood was found on appellant's work boots recovered in the search of his trailer. Magee's blood was also found on the jeans in the dumpster near appellant's trailer.

The only alternative hypotheses offered by appellant at trial were that Magee's murder may have been related to his child support payments or to his drug use. Appellant supported these hypotheses with the alibi testimony of his stepson. However, appellant never proved the existence of a person who had motive or opportunity to kill Magee over child support or drugs. The unnamed, and otherwise unidentified, individuals in the pickup truck seen by Laura Gilreath were not implicitly or explicitly tied into either hypothesis. The stepson admitted that a person could have used the trailer's back door without being seen by him. Even though Jerry Rogers did not see appellant around Magee's apartment on the night of the murders, Rogers admitted that he did not continuously watch that apartment from his living room window.

We find that the combined and cumulative force of all the incriminating circumstances lead us to conclude there was sufficient evidence for any rational trier of fact to conclude beyond a reasonable doubt that appellant was guilty, and to exclude every other reasonable hypothesis except for that guilt. *Russell v. State*, 665 S.W.2d, at 776; *Butler v. State*, 769 S.W.2d, at fn. 1. Point of error seven is overruled.

In his sixth point of error, appellant argues the "trial court erred in overruling appellant's motion for mistrial after the State made a patently improper argument before the jury at the close of the punishment phase of evidence." During the closing argument at punishment, the attorney for the State began to discuss the second special issue [see TEX.CODE CRIM.PROC.ANN. Art. 37.-071(b)(2) [4]]:

"That leads us to the second question. Is there a probability that this man is going to do violence in the future? They talk about the fact that, well, that's a long span of time in there, a long span of time. Killed his brother in 1974 and these deaths were not committed until 1987. That is thirteen whole years. Maybe thirteen years was an unlucky number, I do not know. But I do know that Eddie Johnson's first death was that of his own broth-

er. I do know the next death he was involved in were people who his own son said on the stand were his friends. And it has been multiplied three times. You want to wait another thirteen years and multiply that by three times again? And this time it will probably be somebody he does not even know."

In his brief, appellant raises three complaints regarding this argument. First, he argues that the statement went outside the record in asserting that it was likely that the next time appellant will kill three times as many people as he did in the instant case. Second, he asserts that the attorney for the State invited the jury to consider the possibility that, if given a life sentence, appellant would be paroled within thirteen years. Third, he complains that the argument was intended to intimidate and threaten the jurors with the implication that they would be appellant's next victims.

■■■ During trial, appellant only objected as to the first ground, that the State's argument went outside the record. Therefore, appellant failed to preserve the other two arguments because he raised them for the first time on appeal. TEX.R.APP.P. Rule 52(a); *Johnson v. State*, 803 S.W.2d, at 292, and cases cited therein. At trial, after the State made the complained-of argument, the following exchange occurred:

DEFENSE: "Your Honor, I'll object to that as completely outside the record and offered for the purpose of prejudice only.

TRIAL COURT: "Was there some evidence by—to the witness, wasn't it?

STATE: "Your Honor, I thought I heard evidence in this case that Mr. Johnson was responsible for the shooting and death of his brother, and we've seen the evidence presented in the guilt/innocence stage as far as the events surrounding the circumstances of David Magee and the other two bodies that were found contemporaneous with that.

DEFENSE: "No. What he just told the jury, Your Honor, is that in thirteen years, Mr. Johnson will kill nine people, and

---

4. Now, see TEX.CODE CRIM.PROC.ANN. Art.   37.071(b)(1).

there's not any evidence to indicate that and that's not proper argument.

TRIAL COURT: "I sustain that.

STATE: "Well, Your Honor, I think that I'm allowed to argue what can be inferred from the evidence as Counsel did.

DEFENSE: "Your Honor, we ask that the jury be instructed to disregard that.

TRIAL COURT: "Disregard the last statement.

DEFENSE: "We'd also move for a mistrial.

TRIAL COURT: "Denied."

The only issue before this Court on this point of error is whether the trial court's instruction to disregard was sufficient to cure any argument outside the record by the State.

In response to appellant's objection, the attorney for the State contended that his argument was a reasonable deduction from the evidence. At punishment, the State established that appellant killed his brother in 1974. The State proved at trial that appellant murdered three more people, Magee, Cadena and Galvan, in 1987. In its response to the trial objection, the State asserted it was not unreasonable to argue that appellant would be likely "to do violence in the future," to the extent that he would be capable of murdering three times as many people within thirteen years as he did in 1987.

Even if the State's argument was not a reasonable deduction from the evidence and, therefore, improper, it was not so highly prejudicial that it could not be cured. We find the trial court's prompt instruction to disregard was sufficient to cure any error from the argument. *McKay v. State*, 707 S.W.2d 23, at 37 (Tex.Cr.App.1985), cert. denied 479 U.S. 871, 107 S.Ct. 239, 93 L.Ed.2d 164; *Andujo v. State*, 755 S.W.2d 138, at 144 (Tex.Cr.App.1988); and *Long v. State*, 823 S.W.2d 259, at 270 (Tex.Cr.App.1991). Appellant's sixth point of error is overruled.

The judgment of conviction is affirmed.

CLINTON, J., concurs in the result.