No. 04-98-00355-CR



Robert ESCOBEDO,


Appellant



v.



The STATE of Texas,


Appellee



From the 226th Judicial District Court of Bexar County, Texas 


Trial Court No. 97-CR-0338-A


Honorable Sid L. Harle, Judge Presiding



Opinion by: Tom Rickhoff, Justice


Sitting: Tom Rickhoff, Justice 

 Paul W. Green, Justice 

 Karen Angelini, Justice


Delivered and Filed: May 19, 1999 



AFFIRMED


 A jury convicted Robert Escobedo and his codefendant, Robert Guevara, of two counts of
aggravated sexual assault and sentenced them to twenty years on each count. In five issues presented
Escobedo disputes the legal and factual sufficiency of the evidence to support his conviction, the
effectiveness of the assistance rendered by his trial counsel, and the trial court's decisions not to
instruct the jury on "reasonable doubt" at the punishment phase and not to grant him a new trial. We
affirm.

Facts


 Because Escobedo attacks the sufficiency of the evidence to support his conviction, a detailed
rendition of the facts is in order.

 Mary Smith(1) testified she met Escobedo about a month before the incident, in May 1996,
when she was fourteen. She said she and Escobedo agreed to go to the movies in June and he agreed
to pick her up on a street corner near her house. (Smith said she did not want Escobedo to know
where she lived.) Smith said that when Escobedo arrived to pick her up, Guevara was with him; she
said she was told they would be dropping Guevara off on the way to the movies. The trio went to
Escobedo's house, a small garage apartment behind a larger house where Escobedo's grandparents
lived. Escobedo said he was going to pick something up and went in the house. At that point, Smith
said, Guevara told her to get out of the truck and come inside:

 [SMITH]: then Robert told me to get off the truck and I told him no, I wasn't going
to get off the truck. Then he grabbed me by my arm and tugged at me, he jerked at
me and -- 

 Q. What happened after he tugged at your arm?

 [SMITH]: I told him to stop. At that point I saw like a shiny reflection. I wasn't
really sure what it was.

 Q. Where did you see the shiny reflection?

 [SMITH]: I saw Robert with it in his -- he had it in his hand.

 Q. What did it look like?

 [SMITH]: At first I wasn't really sure, but then I saw that it was a gun.

 Q. What happened after you saw the gun?

 [SMITH]: I got scared so I just listened to him and I got off the truck.

 Smith also said that Guevara held the gun against her as they walked to the tiny apartment,
where Escobedo was unlocking the door. 

 Smith said Escobedo forced her to have sex with him in the bathroom of the little house. 
After he was done, Smith said, Escobedo left and Guevara came in and asked what had happened. 
She said she told him; Guevara then asked if she knew anyone who wanted to buy purses. Then
Guevara asked her to kiss him; she said Guevara then unzipped his pants and pulled hers down. 
Smith said that as Guevara forced himself on her, he held the gun against her jaw. 

 After Guevara was done, Smith said, she went into the front room, which contained a
television and Guevara's bed. She said Escobedo and Guevara forced themselves on her twice again. 
 After they were done, Smith said, Guevara wanted to kill her, but Escobedo argued they should
simply take her home, which they did. Smith said she did not tell anyone what happened until
September. Smith said she picked Guevara and Escobedo out of a photo line-up. She also
acknowledged she had been "fooling around" at a party with another boy and so was not a virgin at
the time she reported the rape.

 On cross-examination, Smith said she had talked to Escobedo several times between their
meeting and the night of the rape. She said that at first she didn't realize the weapon she saw in
Guevara's hand was a gun, but realized what it was when she got out of the truck. She said Guevara
told her he was going to "blow away your brains" if she didn't shut up. She also admitted to running
away from home several times. 

 Julio Ramirez Jr. testified he was Smith's algebra teacher at Lanier High School. He said
he noticed Smith, who along with her classmates had to qualify for his algebra class as part of
Lanier's magnet school program, was often inattentive and distracted. He said when he saw her
grades for the first period would not be good, he took her into the hallway during class early in
October and started asking what was wrong. Ramirez said she eventually told him she was afraid
of two boys because they had raped her. He said Smith told him that she had met one boy at a party,
that he had asked her to go to the movies, that instead they went to his house -- a small garage
apartment -- and watched TV and kissed, that he then got her in the bathroom and forced himself
on her. Ramirez said she told him that after he was done, another boy came in and that the other boy
held her down while the second boy raped her. He also said she fought back, but "they put the gun
to my head again." At that point, Ramirez said, he referred Smith to a counselor at the school; two
weeks later an officer came to the school and took his statement. Ramirez also said he believed
Smith when she told him she had been raped. 

 Anthony L. Trevino Jr. said he was the San Antonio policeman who took the report from
Ramirez. He said he interviewed Smith for about an hour, about two weeks after her outcry
statement to Ramirez. Trevino said after that interview Smith gave him the telephone number of the
boy who had asked her out to the movies that night. He said the dispatcher looked up that number;
knowing the address, he asked Smith and her mother to ride with him in the area and hopefully point
out the place where the incident happened. He said Smith picked out the location immediately.

 On cross-examination Trevino said Smith told him she first met the perpetrator at a movie
theater off Loop 410. He said Smith told him she was threatened, but didn't say exactly where. He
said that she told him Escobedo raped her in the bathroom; then Guevara came in and they took her
to the bedroom and both raped her. 

 Clifford Joseph Cedotal said he was the San Antonio detective in charge of the case. He said
he brought Smith in to the office and took a statement from her. He said he then called in Escobedo
and asked him to come in and give a statement. He said Escobedo claimed not to know Smith when
he first showed him her photograph; when told his residence and his truck had been implicated, he
said Guevara had been the one to assault Smith. 

 According to Escobedo's statement, Smith approached them; he said she looked "messed up,
on drugs." According to the statement, Escobedo gave Smith his pager number; she paged him
around 11:30 that night; that when he went to get her she smelled of alcohol; that she was teasing
and fondling both Escobedo and Guevara; that Escobedo left her with Guevara in his room while he
went to his parents' house to eat; and that when he came back she was crying and demanding to be
taken home. Escobedo also said someone who sounded like Smith left him a telephone message: 
"We are going to [screw] you over."

 Cetodal said Guevara later came in and provided a statement. According to Guevara's
statement, they met Smith after playing basketball in the neighborhood; that Escobedo gave her his
pager number; that they went to get her about 11 p.m., after she paged them; that no one had sex with
Smith, although Smith told them she had condoms with her; that she got frustrated because they
didn't want to have sex with her, and asked them to take her home.

 Nancy Kellogg was the physician at the Alamo Children's Advocacy Center who examined
Smith. She said Smith reported difficulty sleeping, an inability to concentrate, a fluctuating appetite
and fear of going out after the incident; she also said Smith told her of an attempt to overdose on
pills. Kellogg said these symptoms, as well as Smith's demeanor, were typical of women who had
been raped which she had examined. She also reported a vaginal discharge after the rape, which
Kellogg said also was consistent. Kellogg also said Smith told her she had had a consensual sexual
encounter in August 1996. 

 Kellogg said Smith told her that Bobby "Escobel" had asked her out and was going to go to
the movies when he said he had to go by his house to pick something else; that "his friend Robert"
was there and threatened her with a gun; that Bobby raped her in the bathroom; that he used a
condom for part of the time; that Robert "did the same things;" that they then went to Bobby's room
where the assault continued; and that the two dropped her off near her house. 

 Robert Guevara Jr. said he and Escobedo were playing basketball on a neighborhood court
the night of the incident. When they finished, Guevara said, they were driving away when Smith
flagged them down and asked for a ride to a friend's house. Guevara said he had never seen her
before that day. During the ride, Guevara said Smith asked if Escobedo had a girlfriend and got his
pager number. 

 About 10:30 that night, Guevara said, he went over to Escobedo's house and got on his
telephone to talk to a woman he knew; he said he finally had to get off the phone because Smith was
paging Escobedo. Guevara said the two of them went to pick up Smith, who he said wanted to party
and to talk about family problems. Guevara said Smith appeared to have been drinking when they
picked her up. He said they went back to Escobedo's house, where he got back on the phone. He
said Escobedo talked to Smith for awhile, then went to use the bathroom, and that Smith followed
him in there after a short time. Guevara said that when Escobedo came out he announced he was
going up to his parents' house to eat; and that after Escobedo was gone, Smith told him Escobedo
didn't want to have anything to do with her. When Escobedo came back, Guevara said, she asked
to be taken home; so they both took her home. 

 Guevara denied either of them sexually assaulted Smith and denied either of them had a
weapon. 

 Bobby Escobedo testified he and Guevara were playing basketball on the day in question; at
the end of their game, as they were leaving, Escobedo said Smith flagged them down and asked for
a ride to a friend's house. At the end of that ride, Escobedo said, he gave her his beeper number "to
be nice." Later that night, after attending church services, Escobedo said Smith paged him; so he
and Guevara went to pick her up. Escobedo said Smith smelled like smoke and alcohol and put her
hands on their legs; when they got to his house, Escobedo said, Smith went willingly. 

 Escobedo said Smith was flirting and talking about family problems in his house while
Guevara talked on the telephone. At one point, Escobedo said, he went to urinate; after a short time
Smith appeared in the bathroom with him and pulled out a condom; he told her he wasn't interested
and left the restroom. He said he went to his grandparents' house in front to get something to eat at
that point; when he came back, he said Smith demanded to be taken home. He also said she
continued to flirt and at one point showed him a condom and smiled. 

 Escobedo denied raping Smith and denied anyone forced her to do anything that night. He
also said Smith called just before he was called to the police station to tell him that "we are going
to [screw] you over."

 Louis Jaspers testified he was the pastor of St. Gabriel's, where Guevara was an altar boy for
seven years. He said Guevara's character for truth was good. He said Escobedo also had been an
altar boy, but for a short time several years before. Jaspers said he had not heard if Guevara was
involved in the Kings gang. 

 Guevara retook the stand to deny membership in the Kings gang. 

 Julian Escobedo testified he was Robert Escobedo's grandfather. He testified his bedroom
was 50 or 60 feet from his grandson's apartment, and that he did not hear any commotion or
disturbance on the night in question.

 Sofia Escobedo testified she was Robert Escobedo's grandmother. She said she heard no
noises on the night in question.

 Alberto Gutierrez testified he was Robert Escobedo's pastor. He said Escobedo was a nice
young man who participated in church services. 

 Michelle Navarro said she was Escobedo's girlfriend and that she had never known him to
be sexually aggressive toward her. 

Sufficiency of the Evidence


 In his fourth issue Escobedo argues the evidence is legally insufficient to sustain his
conviction; in his fifth issue Escobedo argues the evidence is factually insufficient to sustain his
conviction. Because resolution of these issues requires two different standards, we take each in turn. 

 1. Legal sufficiency

 Legal sufficiency is the constitutional minimum required by the Due Process Clause of the
Fourteenth Amendment to sustain a criminal conviction. See Jackson v. Virginia, 443 U.S. 307,
315-16 (1979). The standard for reviewing a legal sufficiency challenge is whether any rational
trier of fact could have found the essential elements of the offense beyond a reasonable doubt.
Jackson, 443 U.S. at 320; Johnson v. State, 871 S.W.2d 183, 186 (Tex. Crim. App. 1993), cert.
denied, 511 U.S. 1046 (1994). The evidence is examined in the light most favorable to the jury's
verdict. Jackson, 443 U.S. at 320; Johnson, 871 S.W.2d at 186. The standard is the same in both
direct and circumstantial evidence cases. Geesa v. State, 820 S.W.2d 154, 162 (Tex. Crim. App.
1991). All of the evidence is considered by the reviewing court, regardless of whether it was
properly admitted. Johnson, 871 S.W.2d at 186; Chambers v. State, 805 S.W.2d 459, 460 (Tex.
Crim App. 1991); Thomas v. State, 753 S.W.2d 688, 695 (Tex. Crim. App. 1988). This is
because the jury does not err in relying on evidence ruled admissible by the trial judge, and
because the remedy for improper admission of evidence is remand, not acquittal. Thomas, 753
S.W.2d at 695. A successful legal sufficiency challenge will result in rendition of an acquittal by
the reviewing court. Tibbs v. Florida, 457 U.S. 31, 41- 42 (1982).

 The sufficiency of the evidence is measured against the offense defined by a hypothetically
correct jury charge. Malik v. State, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). Such a
charge would include one that "accurately sets out the law, is authorized by the indictment, does
not unnecessarily increase the State's burden of proof or unnecessarily restricts the State's theories
of liability, and adequately describes the particular offense for which the defendant is tried." Id.

 The jury is the trier of fact, and is the ultimate authority on the credibility of witnesses and
the weight to be given to their testimony. See Tex. Code Crim. Proc. Ann. Art. 38.04 (Vernon
1979); Penagraph v. State, 623 S.W.2d 341, 343 (Tex. Crim. App. [Panel Op.] 1981). It is for
the jury as trier of fact to resolve any conflicts and inconsistencies in the evidence. Bowden v.
State, 628 S.W.2d 782, 784 (Tex. Crim. App. 1982). Even where there is no conflict, the jury
may give no weight to some evidence, and thereby reject part or all of a witness's testimony. See
Beardsley v. State, 738 S.W.2d 681, 684 (Tex. Crim. App. 1987); see also Chambers, 805
S.W.2d at 461 (holding jury as judge of credibility may "believe all, some, or none of the
testimony"). Because it is the province of the jury to determine the facts, any inconsistencies in
the testimony should be resolved in favor of the jury's verdict in a legal sufficiency review. 
Johnson v. State, 815 S.W.2d 707, 712 (Tex. Crim. App. 1991) (quoting Moreno v. State, 755
S.W.2d 866, 867 (Tex. Crim App. 1988)).

 Escobedo's specific complaint of insufficiency centers on the deadly weapon finding, which
is a necessary element of aggravated sexual assault. See Tex. Penal Code Ann. § 22.021
(Vernon 1994). He claims the evidence supporting this finding was insufficient; that the jury had
doubts as well, as evidenced by a note during deliberations; and that we should essentially second-guess the jury's verdict. We disagree; Escobedo's complaint misstates the standard of review. 
We view the evidence in the light most favorable to the jury's verdict. Both on direct and cross-examination Smith said she saw the weapon, recognized it as a deadly weapon, and that she was
threatened with it. Viewed in the correct light, we believe any rational trier of fact could have
found all the elements of aggravated sexual assault, including the use of a deadly weapon, given
this testimony. 

 Furthermore, the state did not have to negate the "antique" exception contained in Tex.
Penal Code Ann. § 46.01(3) (Vernon 1994). That statutory exception pertains only to weapons
possession offenses, not assaultive offenses like the one before us today. See Vaughn v. State, 600
S.W.2d 314, 315 (Tex. Crim. App. 1980). The issue is overruled. 

 2. Factual Sufficiency

 We now turn to whether the evidence was factually sufficient to sustain Rangel's
conviction. See Clewis v. State, 922 S.W.2d 126 (Tex. Crim. App. 1996). The factual
sufficiency review process begins with the assumption that the evidence is legally sufficient under
the Jackson standard. Clewis, 922 S.W.2d at 134 (citing Stone v. State, 823 S.W.2d 375 (Tex.
App.--Austin 1992, pet. ref'd, untimely filed). The appellate court then considers all of the
evidence in the record related to appellant's sufficiency challenge, not just the evidence which
supports the verdict. Id. The appellate court reviews the evidence weighed by the jury which
tends to prove the existence of the fact in dispute, and compares it to the evidence which tends to
disprove that fact. Santellan v. State, 939 S.W.2d 155, 164 (citing Ellis County State Bank v.
Keever, 915 S.W.2d 478, 479 (Tex.1995) and Transportation Ins. Co. v. Moriel, 879 S.W.2d 10,
31 (Tex.1994)). The court is authorized to disagree with the jury's determination, even if
probative evidence exists which supports the verdict. Clewis, 922 S.W.2d at 133; see also In Re
King's Estate, 150 Tex. 662, 244 S.W.2d 660, 661 (1951).

 However, factual sufficiency review must be appropriately deferential so as to avoid the
appellate court's substituting its own judgment for that of the fact finder. Clewis, 922 S.W.2d at
133. The court's evaluation should not substantially intrude upon the jury's role as the sole judge
of the weight and credibility of witness testimony. Santellan, 939 S.W.2d at 164 (citing Pool v.
Ford Motor Co., 715 S.W.2d 629, 635 (Tex. 1986); Benoit v. Wilson, 150 Tex. 273, 239 S.W.2d
792, 796 (1951); and In Re Thoma, 873 S.W.2d 477, 485 (Tex. Rev. Trib. 1994)). We reverse
only when the verdict is against the great weight of the evidence presented at trial so as to be
clearly wrong and unjust, i.e., when the jury's finding is "manifestly unjust," "shocks the
conscience," or "clearly demonstrates bias." Clewis, 922 S.W.2d at 135 (citing Meraz v. State,
785 S.W.2d 146, 149 (Tex. Crim. App.1990)). This standard grants the appropriate deference
to the jury's verdict and prevents the reviewing court from substituting its judgment for that of the
jury. Santellan, 939 S.W.2d at 164.

 Considering the state of the record before us today, we cannot say this verdict is manifestly
unjust or clearly demonstrates bias. We therefore overrule Escobedo's fourth issue.

Motion for New Trial


 In his third issue Escobedo argues the trial court abused its discretion in not granting a
motion for new trial. The gist of his complaint is that the jury "received" evidence through juror
Norma DeSoto, who stated in her affidavit and testimony that she shared her mother's experience
with gang vandalism with the other jurors. DeSoto said she believed this experience encouraged
other jurors to vote for a longer sentence. 

 Jurors may not receive other evidence after they have retired to deliberate. Tex. R. App. P.
21.3(f). The defendant must show that the jury actually received other evidence and that the other
evidence was detrimental. Stephenson v. State, 571 S.W.2d 174, 176 (Tex. Crim. App. [Panel Op.]
1978). Whether the jury has "received" other evidence is a fact question to be decided by the trial
court and may also be a question of degree in some circumstances. See Guice v. State, 900 S.W.2d 
387, 389 (Tex. App.--Texarkana 1995, pet. ref'd). 

 Additionally, at a hearing on the motion for new trial, the trial judge is the trier of fact and
the sole judge of the credibility of the witnesses. Lewis v. State, 911 S.W.2d 1, 7 (Tex. Crim. App.
1995). The trial court's ruling on a motion for new trial will not be disturbed absent an abuse of
discretion. Id. When the basis of a motion for new trial is jury misconduct, and evidence at the
hearing is conflicting, there is no abuse of discretion if the trial court overrules the motion for new
trial. Tollett v. State, 799 S.W.2d 256, 259 (Tex. Crim. App. 1990).

 Here the defense attorneys called two jurors as witnesses at the motion for new trial hearing;
the state called two jurors as witnesses. Their testimony was conflicting as to whether jurors
improperly considered one juror's prior experience with gangs. Juror DeSoto contended that her
information actually changed votes on the jury at punishment; juror Corey, who was eventually
elected foreman, said the remark was an "off-the-wall conversation" which she told the other jurors
to ignore. 

 Information which is treated as a "passing remark" does not require reversal. Stephenson,
571 S.W.2d at 176. This court elaborated on this observation in Bratcher v. State, 771 S.W.2d 175,
189 (Tex. App.--San Antonio 1989, no pet.). In Bratcher, part of a defendant's story was that he
was watching a particular television program just before the murder. Id. at 179. One juror, who was
eventually elected foreman, brought a television schedule and stated that he could not find the
program referenced by defendant on the schedule. Id. at 185. While one juror admitted he may have
"glanced" at the paper, the other seven jurors questioned said they did not. Id. After another juror
pointed out that jurors didn't know what kind of cable or satellite service may have been available
to defendant at the time, the "foreman" pocketed the schedule and admonished the others that it
should not be considered. Id. This court, noting the "passing remark" standard in Stephenson, added
that "this is particularly true where the remark is followed by corrective action" and overruled the
issue. Id. 

 Here the eventual foreman of the jury said she urged the other jurors to ignore juror DeSoto's
remark about gang activity. Moreover, the other jurors' testimony did not conclusively show that
Escobedo was prejudiced by DeSoto's remark. Because of the state of this record, which includes
conflicting testimony, we find the trial court did not err in overruling the motion for new trial. We
therefore overrule Escobedo's third issue.

Defining "Reasonable Doubt"


 In his first issue Escobedo contends the trial court reversibly erred by not submitting an
instruction on "reasonable doubt" at the punishment phase of trial. He complains that the state
alleged throughout the trial that he belonged to a gang, and that as a result of this he was entitled to
an instruction on "reasonable doubt" at the punishment phase of his trial. The State argues that there
was no evidence of Escobedo's gang membership before the jury and that Escobedo was therefore
not entitled to this instruction. 

 A defendant who requests an instruction on reasonable doubt at the punishment phase of trial
is entitled to it when the state seeks to prove extraneous crime or bad act against the defendant. 
Mitchell v. State, 931 S.W.2d 950, 954 (Tex. Crim. App. 1996) (plurality op.) (interpreting Tex.
Code Crim. Proc. Ann. art. 37.07, § 3(a) (Vernon Supp. 1999)). This court has found that failure
to instruct a jury on the definition of "reasonable doubt" under these circumstances is reversible
error, even when a defendant does not so request. See Fields v. State, 966 S.W.2d 736, 741 (Tex.
App.--San Antonio 1998, pet. granted) (interpreting Tex. Code Crim. Proc. Ann.. art. 37.07, §
3(b)). On the other hand, a trial court would properly refuse an instruction, even if requested, if the
issue is not raised by the evidence. Brooks v. State, 642 S.W.2d 791, 799 (Tex. Crim. App. 1982);
Washington v. State, 905 S.W.2d 665, 667 (Tex. App.--Houston [14th Dist.] 1995, pet. ref'd);
Dominguez v. State, 759 S.W.2d 185, 189 (Tex. App.--San Antonio 1988, pet. ref'd). We must
therefore decide whether the evidence dictated the submission. 

 Our record fails to reveal any instance where prosecutors sought to introduce evidence
linking Escobedo to gang activity, although they did seek to tar his codefendant with that brush. In
light of this fact, we find Escobedo was not entitled to this instruction; no error is shown. 
Escobedo's first issue is overruled.

Ineffective Assistance of Counsel


 In his second issue Escobedo contends his trial counsel rendered ineffective assistance at the
punishment phase of his trial. The court of criminal appeals has held that the standard for assessing
ineffective assistance of counsel at the punishment phase of non-capital trials in Texas is that set
forth in Strickland v. Washington, 466 U.S. 668 (1984). Hernandez v. State, No. 506-97, 1999
WL 212791 (Tex. Crim. App. April 14, 1999). 

 The Strickland test focuses on reasonableness, measuring the assistance received against
the prevailing norms of the legal profession. Strickland, 466 U.S. at 690. Counsel is presumed
to have rendered adequate assistance, and it is incumbent on the defendant to identify those acts
or omissions which do not amount to reasonable professional judgment and are outside the "range
of professionally competent assistance." Id. To show prejudice, the defendant must show "a
reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding
would have been different." Strickland, 466 U.S. at 694. The representation is to be evaluated
as at the time of trial and not through hindsight. Ex parte Wellborn, 785 S.W.2d 391, 393 (Tex.
Crim. App. 1990). The key question becomes whether counsel's conduct so undermined the
proper functioning of the adversarial process that the trial cannot be relied on as having produced
a just result. See Castoreno v. State, 932 S.W. 2d 597, 604 (Tex. App. -- San Antonio 1996,
pet. ref'd) (citing Strickland, 466 U.S. at 687). 

 The constitutional right to counsel, whether appointed or retained, does not mean errorless
counsel. Castoreno, 932 S.W.2d at 604.Whether the Strickland standard has been met is to be
judged by the "totality of the representation" rather than by isolated acts or omissions of trial
counsel, and the test is applied at the time of the trial, not through hindsight. Wilkerson v. State, 726
S.W.2d 542, 548 (Tex. Crim. App. 1986), cert. denied, 480 U.S. 940 (1987); Banks, 819 S.W.2d at
681. The burden of proving ineffective assistance by a preponderance of the evidence rests upon the
convicted defendant. McFarland v. State, 845 S.W.2d 824, 842 (Tex. Crim. App. 1992), cert.
denied, 508 U.S. 963 (1993); Moore v. State, 694 S.W.2d 528, 531 (Tex. Crim. App. 1985). 

 Here Escobedo's complaint centers on 1) trial counsel's failure to request a definitional
instruction on "reasonable doubt" at the punishment phase of the trial; 2) trial counsel's failure to
anticipate the use of Escobedo's criminal record against him. We will take each allegation in turn.

 1. Reasonable doubt 

 Escobedo complains that the state alleged throughout the trial that he belonged to a gang, and
that as a result of this he was entitled to an instruction on "reasonable doubt" at the punishment
phase of his trial. In our resolution of his first issue we held that because the state did not seek to
prove that Escobedo was a gang member, he was not entitled to an instruction on "reasonable doubt"
at the punishment phase. We therefore find Escobedo's trial counsel was not ineffective in this area.

 2. Criminal record

 Escobedo also complains that trial counsel failed to anticipate use of his criminal record
against him at punishment. The State first sought to introduce details of a misdemeanor unlawful
carrying of a weapon charge, an offense for which Escobedo received deferred adjudication, through
a police officer. After prosecutors told a bench conference their intention, they failed to call the
officer. Escobedo then took the stand to ask for leniency, at which time prosecutors grilled him about
the prior offense. 

 We interpret this as an attack on the trial counsel's decision to call Escobedo as a witness at
punishment and so expose him to this cross-examination. As such it must fail. Escobedo had an
absolute right to testify in his own behalf. U.S. Const. amends. VI and XIV; Tex. Const. art. I, §
10. Moreover, the record is silent as to why Escobedo testified at punishment; we do not know
whether it was his call or his trial counsel's call. Since the record is silent on this point, it fails to
rebut the strong presumption that counsel rendered adequate assistance. Strickland, 466 U.S. at
690. 

 Escobedo also asks us to adopt a new, per se rule that calling to the stand at punishment a
defendant who has denied guilt at guilt-innocence should be an automatic instance of ineffective
assistance. Like the prior contention, this contention cannot withstand the silence of the record. 

 Escobedo's second issue is overruled; we affirm the judgment of the trial court. 


 Tom Rickhoff, Justice

Do Not Publish


1. "Mary Smith" is the pseudonym adopted by the complainant for trial.