# In The

## *Court of Appeals*

## *Ninth District of Texas at Beaumont*

_____

**NO. 09-15-00087-CR**
**NO. 09-15-00088-CR**

_____

**BOBBY GENE MARTIN, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 221st District Court**
**Montgomery County, Texas**
**Trial Cause No. 14-08-08496-CR (Counts 1 and 2)**

## MEMORANDUM OPINION

In this appeal, Bobby Gene Martin challenges the sufficiency of the evidence supporting his convictions for driving while intoxicated and retaliation. Martin received life sentences from the jury after pleading "true" to the State's habitual offender allegations. We overrule the issues and affirm the trial court's judgment.

We review the sufficiency of the evidence to support a conviction under the standard set forth in *Jackson v. Virginia*. 443 U.S. 307, 319 (1979); *see Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010). The *Jackson* standard is the only standard that we apply in an evidentiary-sufficiency review. *Adames v. State*, 353 S.W.3d 854, 859 (Tex. Crim. App. 2011). Under that standard, we view all of the evidence in the light most favorable to the verdict and determine, based on that evidence and any reasonable inferences therefrom, whether any rational factfinder could have found the essential elements of the offense beyond a reasonable doubt. *Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013) (citing *Jackson*, 443 U.S. at 318–19). The jury is the sole judge of the credibility and weight to be attached to the testimony of the witnesses. *Id*. In this role, the jury may choose to believe all, some, or none of the testimony presented by the parties. *Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991). Further, the jury is permitted to draw multiple reasonable inferences from facts as long as each is supported by the evidence presented at trial. *Temple*, 390 S.W.3d at 360. When the record supports conflicting inferences, we presume that the jury resolved those conflicts in favor of the verdict and therefore defer to that determination. *Id*.

In reviewing the sufficiency of the evidence, we consider all of the evidence in the record, regardless of whether it was properly admitted. *Clayton v. State*, 235

2

S.W.3d 772, 778 (Tex. Crim. App. 2007). Direct and circumstantial evidence are equally probative of an actor's guilt, and "'circumstantial evidence alone can be sufficient to establish guilt.'" *Temple*, 390 S.W.3d at 359 (quoting *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007)). In a circumstantial evidence case, each fact need not point directly and independently to the guilt of the defendant so long as the combined and cumulative force of all the incriminating circumstances warrants the conclusion that the defendant is guilty. *Id*. (quoting *Johnson v. State*, 871 S.W.2d 183, 186 (Tex. Crim. App. 1993)); *Hooper*, 214 S.W.3d at 13. "After giving proper deference to the factfinder's role, we will uphold the verdict unless a rational factfinder must have had reasonable doubt as to any essential element." *Laster v. State*, 275 S.W.3d 512, 518 (Tex. Crim. App. 2009).

"[I]n order for the evidence to be sufficient to support a conviction for driving while intoxicated, there must be a temporal link between . . . a defendant's intoxication and his driving. But a conviction can be supported solely by circumstantial evidence." *Kuciemba v. State*, 310 S.W.3d 460, 462 (Tex. Crim. App. 2010). A high blood alcohol limit found in a sample taken at the scene of an accident "supports an inference either that appellant was recently involved in the accident or that he had been intoxicated for quite a while." *Id.* at 463. The

appellant's flight from the scene supports an inference of guilt. *Clayton*, 235 S.W.3d at 780.

In his appeal brief, Martin argues the State failed to prove that he was the person that 911 callers observed driving a truck erratically on the roadway before it came to rest in a ditch. A wrecker driver, Jason Kroll, testified that he responded to a dispatch call and arrived at the scene of an accident that night. Kroll identified Martin as the person he saw standing in the middle of the road as he approached the scene in his wrecker. Martin was approximately ten feet away from a truck in the ditch. Martin appeared to be intoxicated, stumbling several times as he walked 100 feet to where Kroll had stopped his wrecker. Kroll did not see Martin behind the wheel or driving the truck, but no one else was around, and Martin did not mention that anyone was in the vehicle with him. According to Kroll, Martin asked him to "get him out of there before the cops got there because he couldn't afford another DWI." Kroll stated that when he refused to help, Martin walked away towards the woods. When the police arrived five or ten minutes later, Kroll directed the officers to the spot where Martin approached the tree line.

Deputy Johnathon Jordan testified that he was dispatched in response to 911 calls describing a male subject wearing dark clothing standing near a black vehicle in the ditch. As Deputy Jordan pulled up to the scene, he noticed a black pickup

truck in the ditch. Kroll pointed down the road and said it looked like Martin went into the woods. Deputy Jordan found Martin in the creek in chest deep water. It appeared that Martin was trying to hide, because he was holding a bush or a branch in front of himself. Martin ignored Deputy Jordan's attempts to coax him out of the water for a while, but he eventually climbed out on his own. Deputy Jordan was able to obtain Martin's name and date of birth and ran the information through dispatch. Martin told the officer he was drunk but refused to say whether he had been driving. The keys on Martin's belt belonged to the vehicle that was in the ditch. Martin showed all six signs of intoxication on the horizontal gaze nystagmus field sobriety test. Martin displayed seven of eight intoxication clues on the walk-and-turn field sobriety test. Deputy Jordan decided not to administer the one-leg stand test out of concern for Martin's safety. Deputy Jordan obtained a warrant for a blood sample. A blood sample obtained three hours after Deputy Jordan arrived on the scene revealed that Martin had a blood alcohol concentration level of approximately 0.217.

The truck in the ditch was registered to a woman at the same address as the address that Martin listed in his records with the Department of Public Safety. Martin repeatedly referred to the vehicle as his truck and told Deputy Jordan, "I am

a better driver than that." Deputy Jordan never saw anyone other than Martin who could have been driving the truck that evening.

The jury heard recordings of motorists who called 911. One caller reported that it appeared that a man had been drinking and was driving. The caller stated that he observed the vehicle swerving and followed it until it ran off the road into a ditch. Another caller reported that an older white male wrecked his black truck. She stated the driver was standing by the guardrail 100 feet from the truck. A third caller, the tow truck driver, reported that the vehicle was in the ditch and the driver, wearing solid black clothing, was out in the road and in danger of being struck by passing vehicles. He reported that the driver of the vehicle asked to be pulled out of the ditch. Another caller reported that a vehicle drove into the ditch. The caller stated that she had spoken to the man who drove his truck into the ditch. She indicated that he was so intoxicated that he could barely speak or walk but had proceeded along the guardrail and off of the side of the road. None of the callers observed another person in the vehicle. Additionally, on one recording that was published to the jury, Martin can be heard stating, "I can't believe I run the truck over the [expletive] ditch, you know that? I'm a better [expletive] driver than that."

Martin also argues that the evidence is insufficient to prove that he was driving while intoxicated because none of the witnesses saw him driving. He

6

concedes that the jury heard 911 recordings in which callers reported following an erratically-driven vehicle until the vehicle went into the ditch, and a caller described Martin as he stood on the side of the road after the accident, but he argues none of the callers identified Martin as the person operating the truck. Martin argues that his statement to the wrecker driver that he could not afford another DWI amounted to nothing more than his realization that the police would accuse him because he was the only one at the scene. He claims his statement that he was a better driver than that was intended to be a comparison with the real driver, as opposed to a comment on his own driving, and that his expressed concern about the truck arose from the fact that he would be held accountable for the damage and not because he caused it.

Evidence that supports a conclusion that Martin operated the vehicle includes his being outside the truck immediately after the accident, asking for assistance removing the vehicle before the police arrived, attempting to escape from the scene of the accident, and his admission to the driver of the wrecker that he would be arrested for driving while intoxicated. The truck was registered to a person at Martin's residential address, but that person was not at the scene and Martin was, and the keys used to operate the truck were in his pocket. Martin was, by his own admission, intoxicated immediately after the accident and for hours

7

thereafter. "Being intoxicated at the scene of a traffic accident in which the actor was a driver is some circumstantial evidence that the actor's intoxication caused the accident[.]" *Kuciemba*, 310 S.W.3d at 462. The jury could reasonably infer that Martin drove the vehicle on a public roadway, because shortly after a truck was observed being driven erratically into a ditch on a country road, a person matching Martin's description was seen trying to leave the scene and a few minutes later, Martin was hiding in the creek with the keys to the truck in his pocket. Viewed in the light most favorable to the verdict, the jury could conclude that Martin drove the vehicle on a public roadway while he was intoxicated.

Martin argues that insufficient evidence supports his conviction for retaliation. A person commits the offense of retaliation if the person intentionally or knowingly harms or threatens to harm another by an unlawful act in retaliation for or on account of the service or status of another as a public servant. *See* Tex. Penal Code Ann. § 36.06(a)(1)(A) (West Supp. 2016). "Comments can be evaluated as threats based, not just on the language used, but also the context within which they are uttered, even veiled threats." *Meyer v. State*, 366 S.W.3d 728, 731 (Tex. App.—Texarkana 2012, no pet.). Martin became verbally abusive after being arrested by Deputy Jordan. Martin threatened to kill Deputy Jordan and his family and repeated this threat several times during his transport and booking.

8

Martin argues his threats were merely drunken ramblings expressing his anger over being arrested but lacking any intent or ability to act on the threat. An intent to follow through with the threat is not an element of the crime of retaliation. *Lebleu v. State*, 192 S.W.3d 205, 211 (Tex. App.—Houston [14th Dist.] 2006, pet. ref'd). "The [retaliation] statute does not require the threatened retaliatory harm be imminent, nor does it require that the actor actually intend to carry out his threat." *In the Matter of B.P.H.*, 83 S.W.3d 400, 407 (Tex. App.—Fort Worth 2002, no pet.). Among other threatening statements made in this case, Martin stated, "If you don't get these cuffs off me, I'm going to kill your brains out." When Deputy Jordan was preparing to remove the handcuffs at the jail, Martin stated he would "whop your A." The jury could infer that Martin intentionally and knowingly threatened Deputy Jordan on account of Deputy Jordan's service as a law enforcement officer. Therefore, the evidence is legally sufficient to support a conviction for retaliation. We overrule issues one and two. The trial court's judgments and sentences are affirmed.

     AFFIRMED.


_____
CHARLES KREGER
Justice

Submitted on February 1, 2016
Opinion Delivered January 18, 2017
Do Not Publish

Before McKeithen, C.J., Kreger and Johnson, JJ.