NO. 07-01-0478-CR

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL E

FEBRUARY 13, 2003

_____

BARAK LEE BARNUM, APPELLANT

V.

THE STATE OF TEXAS, APPELLEE

_____

FROM THE 47TH DISTRICT COURT OF POTTER COUNTY;

NO. 35,125-A; HONORABLE DAVID L. GLEASON, JUDGE

_____

Before JOHNSON, C.J., REAVIS, J., and BOYD, S.J.[1]

In two points, appellant Barak Lee Barnum challenges the legal and factual sufficiency of the evidence to sustain his conviction for the murder of his wife and the resulting jury-assessed punishment of 35 years confinement in the Institutional Division of

---

[1]John T. Boyd, Chief Justice (Ret.), Seventh Court of Appeals, sitting by assignment. Tex. Gov't Code Ann. §75.002(a)(1) (Vernon Supp. 2003).

the Department of Criminal Justice. Disagreeing that reversal is required, we affirm the judgment of the trial court.

This is appellant's second trial for this offense. His first conviction was reversed because of the erroneous admission of some hearsay exhibits. Except for the exhibits admitted during the first trial, the State's case on retrial mirrored the first trial. Even though the parties are familiar with that evidence, because of the nature of appellant's challenge and in the interest of a full consideration and discussion of that challenge, we will refer to pertinent evidence produced at the second trial in detail.

The State's case against appellant was circumstantial. Appellant and Cathy Barnum (Cathy) were married in 1981. Although their marriage produced three children, they also had difficulties that resulted in periods of separation. In November 1994, while appellant was in residential treatment at the Panhandle Addiction Recovery Center (PARC), Cathy met Blane Jones at a church function and the two soon began dating. On December 5, 1994, Cathy retained an attorney to bring a divorce action. She disappeared on December 6, 1994, and on April 5, 1995, her badly decomposed body was found in a field near the Amarillo International Airport. It was the contention of the State that appellant caused her death by strangling her.

Amarillo Police Officer Robert Mahaffee testified that on December 8, 1994, he went to the couple's residence to investigate a missing person report about Cathy. According to the officer, appellant told him that he had recently been released from the PARC.

Although Cathy had retained an attorney to file for a divorce, she permitted appellant to stay at their residence until he could find other living quarters.

On the evening of December 6, 1994,[2] appellant said he had taken their children out to eat and when they returned, Cathy was asleep. That night was the last time he had seen Cathy. Appellant told the officer that when he tried to telephone Cathy at her workplace the next day, he was told she had not come to work. Mahaffee obtained a description of Cathy and her automobile from appellant. The officer did not notice any marks on appellant's face or hands. At that point in time, there was nothing that distinguished this report from a typical missing person report.

About a month later, on January 4, 1995, after the discovery of Cathy's automobile parked at an apartment complex, Mahaffee again saw appellant. Although he did not speak directly to appellant at the complex, he talked to Cecil Howard, another man who was present there. Cecil told the officer that he had seen what might be Cathy's automobile and he had brought appellant to the location of the car. Mahaffee learned that appellant entered Cathy's car before he arrived at the scene. Because of this, Mahaffee asked if he could search Cecil's vehicle. The officer's purpose in asking for that authority was to see if any articles from Cathy's car had been removed to Cecil's vehicle. The officer found a set of keys to Cathy's car on the front passenger side of Cecil's vehicle.

---

[2]All later references to months will be to those in 1994, unless otherwise specifically identified.

Jackie Bolden (Jackie) testified that she was Cathy's mother and lived several houses down on the same street where appellant and Cathy lived. She visited her daughter some three to five times a week. She said that Cathy's and appellant's marriage had been a troubled one. Indeed, Cathy had filed for divorce twice and had separated from appellant several times.

Jackie last saw Cathy on December 2 at Cathy's office. The first time she learned of Cathy's disappearance was on December 8, when appellant called her and inquired if she knew of Cathy's whereabouts. On the night of Cathy's disappearance, appellant told her Cathy had come home and, although he wanted to discuss their divorce, she did not want to do so because the children were present. Further, he said, Cathy went into their bedroom, summoned him, and the pair had "massive sex." Jackie suspected appellant was responsible for Cathy's disappearance and told the lead investigator so.

The night that Cathy's automobile was found, Jackie went to the scene and noted that when the police asked if anything had been removed from Cathy's car, both appellant and Cecil denied that had occurred. An overnight bag was found in Cathy's car. The contents of that bag led Jackie to believe that Cathy's disappearance was not voluntary. This was true, she concluded, because although Cathy was a stylish dresser, the clothing in the overnight bag was striped and plaid summer wear, which would clash, and they were not suitable for December. Additionally, the bag contained hair rollers but no pins to use with them, and there was no make-up or a make-up mirror. Jackie also felt that Cathy

4

would not have separated from appellant without taking the children with her. In the past, when Cathy left appellant, she had always called Jackie to tell her where she was staying.

Marita Coke, who was the receptionist for the attorney Cathy had retained to bring her divorce against appellant, testified that on December 6, she received a telephone call from a man who represented himself to be appellant. He inquired if Cathy had filed for a divorce. After getting her employer's permission to do so, she informed him that divorce proceedings had been instituted.

Dr. Sparks Veasey, a pathologist, performed an autopsy on Cathy's body on April 6, 1995. He opined that the cause of her death was strangulation.

Randy Jordan, who had been confined with appellant at the Potter County Detention Unit, testified that one day after speaking on the telephone appellant became visibly upset, remarked to him that the police had talked to his children, and said "I think they know I did it." Carey Britt also testified that he met appellant when both of them were in treatment at the PARC, and he heard appellant call Cathy "bitch" in telephone conversations with her. In one such conversation, he heard appellant tell Cathy he would kill her if she did not let him see the children.

Blane Jones averred that he met Cathy in early November 1994 at a church fellowship. They went to dinner the first night of their acquaintanceship, and their relationship progressed from there into intimacy. Cathy told Blane she was separated and was going through a divorce. Later in November, appellant called Blane and told him that

Cathy was still married to him, although his tone of voice was not hostile. Apparently the couple continued their relationship, and Blane was with Cathy at her office on the afternoon of December 6. She left to pick up one of her children and, while doing so, dropped Blane off at his home. He understood that Cathy would stay that night with either one of her sisters, at a motel, or with him. He was certain that she did not intend to stay at her house. When he did not hear from Cathy, he had two of his friends telephone Cathy's residence in an attempt to reach her, but they were unable to do so. On December 7, appellant went to see Blane where he worked as a security guard and inquired about Blane's relationship with Cathy in a somewhat friendly manner. Appellant's conversations with him continued until the police found Cathy's automobile. Blane acknowledged that at one time he had been a suspect in Cathy's disappearance, but he was never arrested.

Gladys Jean Blevins (Jean) testified that she had become a friend of appellant when both were employed at Burger King in Amarillo. In November 1994, appellant telephoned her and told her that Cathy had filed for divorce and would not let him come home. In the course of that conversation, appellant said that if Cathy would not let him see his children, he would kill her.

Jarrod Barnum, one of the couple's children, who was 11 at the time of Cathy's disappearance, said that Cathy picked him up at school on December 6. On the way home, Cathy told Jarrod she was going to spend the night at a motel. She was going to simply drop Jarrod off at the house, but he persuaded her to come inside. After she entered the house, she went into the kitchen and argued with appellant for a few minutes.

6

Jarrod said he thought they resolved whatever dispute they had, and that Cathy, or both of them,[3] went into the bathroom of the master bedroom where they remained for 30 minutes to an hour. Jarrod next peered through the not-quite closed door of the master bedroom and saw appellant at the sink washing his face. In his 1995 statement, Jarrod said he also saw Cathy in bed with the covers up to her chin, but at the second trial, he had no recollection of seeing her that way, but it would have been consistent with her nature as she chilled easily.

Brad Barnum, the couple's youngest son, who was about seven years old in December 1994, recalled that he could not use one bathroom because Cathy was taking a bath as she sometimes did when she returned from work. Although appellant took the boys out to eat that night, Cathy did not go, he said, because she was taking a bath. However, the prosecution pointed out that in his 1995 statement, Brad had said that the only reason he knew that she was taking a bath at the time was because appellant had told him so. When appellant and the boys returned from their meal, Brad said he saw Cathy with the covers pulled up to her chin. He said her lips appeared to be purple and she appeared to be sleeping. He did not go into the room because appellant told them Cathy was sleeping. He opined that everyone's lips might appear to be purple. Appellant and the boys spent the remainder of the evening watching a movie on television. Brad fell asleep before the movie concluded. He slept part of the time on the living room floor and then lay on the sofa next to appellant. When he awoke the next morning, Cathy was gone.

---

[3]In his 1995 statement to the police, he said both of his parents went into the bathroom.

Ryan, the couple's son who was eight in 1994, testified that he walked through Cathy's room to use the master bath and saw her in bed with the covers pulled up to her chin. He also recalled that appellant and the boys fell asleep watching television and that during the night, someone walked across the entryway tile and left through the front door. He thought it was Cathy, but admitted he was not sure whether his recollection was of an actual event or part of a dream. He knew Cathy never came out of the bedroom while the boys and appellant ate or watched the movie. In 1995, Ryan gave a statement in which he said that appellant took the children into the bedroom to see that their mother was asleep after he told them to be quiet but, at the second trial, Ryan had no memory of that event.

Michelle Norman (Michelle) lived across the street from appellant and Cathy. While she socialized with both of them, appellant was a closer friend. About two weeks before appellant was released from the PARC, appellant called her and asked if Cathy was seeing another man. Michelle told appellant about Blane and gave a general description of him. On December 6, Michelle saw Cathy arrive home with Jarrod about 4:00 p.m., shortly after appellant had arrived. About 7:00 p.m., appellant phoned her and told her that Cathy was napping, which she thought was somewhat odd because their telephone conversations usually had some point, such as borrowing something or just to chat. The next morning as Michelle was driving her son to school, they thought Cathy drove by. When Michelle returned home, appellant called and asked if she had seen Cathy leave. She told him about the believed sighting of Cathy shortly before the call. About an hour later, appellant came to Michelle's house and told her that he and Cathy had "wild sex" the evening before

8

and afterward, she took a nap. The next morning, appellant came by again, told her Ryan thought he saw Cathy leave through the front door, initially wondered why she would do that, and then advanced an explanation for that conduct to fit his account of the evening's activities. He also told her about a conversation in which Blane accused him of choking Cathy to death and leaving her body in a field. Appellant additionally referred to the earlier conversation in which Michelle thought she had seen Cathy and remarked to her, "You're my witness."

Cecil testified about the circumstances in which he discovered what he thought was Cathy's car. He called appellant and picked him up to bring him to where the car was located. As they approached the car, appellant got out of Cecil's vehicle before it came to a full stop and entered the car through the passenger side. The police were notified and, upon their arrival, obtained Cecil's permission to search his truck. When they did so, to Cecil's surprise, they discovered a set of keys to Cathy's car.

Legal Sufficiency

Appellant's first challenge is to the legal sufficiency of the evidence. The standard for measuring the legal sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact would have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). We measure the sufficiency of the evidence by the elements of the offense as defined in a hypothetically correct jury charge.

*Malik v. State*, 953 S.W.2d 234, 240 (Tex.Crim.App. 1997). Parenthetically, appellant does not challenge the adequacy of the court's charge.

In making our determination, we consider all of the evidence in a light most favorable to the jury's verdict. *Johnson v. State,* 871 S.W.2d 183, 186 (Tex.Crim.App. 1993), *cert. denied,* 511 U.S. 1046, 114 S.Ct. 1579, 128 L.Ed.2d 222 (1994). In this matter, the State's case is based upon circumstantial evidence. Even so, it is well established that the same review standard is applicable to cases based upon direct or circumstantial evidence. *Houston v. State*, 663 S.W.2d 455, 456 (Tex.Crim.App. 1984).

We are convinced that even without the inadmissible hearsay that led to the reversal of the prior conviction,[4] the circumstantial evidence was sufficient to justify a reasonable jury in believing beyond a reasonable doubt that appellant caused Cathy's death. The evidence supporting the jury's verdict included, but was not limited to, the couple's history of domestic problems, appellant's knowledge of her involvement with another man, her efforts to obtain a divorce, and appellant's threats, albeit conditional, against Cathy's life. Additionally, the jury could reasonably infer from the overnight bag, packed with incomplete items and inappropriate clothing found in Cathy's car was packed by someone, namely appellant, who had access to her personal belongings, but was not familiar with a woman's travel needs. Accordingly, appellant's first point is overruled.

---

[4]*Barnum v. State*, 7 S.W.3d 782, 788-89 (Tex. App.–Amarillo 1999, pet. ref'd).

Factual Sufficiency

In his second point, appellant challenges the factual sufficiency of the evidence. In conducting our factual sufficiency review, we are to review all of the evidence neutrally. *Clewis v. State*, 922 S.W.2d 126, 129 (Tex.Crim.App. 1996). Reversal is only required if the evidence of guilt is so obviously weak as to undermine confidence in the jury's determination or the proof of guilt is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *King v. State*, 29 S.W.3d 556, 563 (Tex.Crim.App. 2000). In our review, we must give appropriate deference to the jury's findings so as not to substitute our judgment for that of the jury. *Clewis,* 922 S.W.2d at 135.

In advancing his factual insufficiency claim, appellant points to several items of evidence which he says controvert the jury's verdict. Included in those items is the fact that in their investigation of Cathy's disappearance, the police did not see any scratches or marks on appellant's face that might have been inflicted if there had been a struggle while strangling her. He also cites evidence that on the night Cathy disappeared, appellant slept with his children on the couch, but none of them recalled him getting up in the night. Further, Ryan recalled Cathy walking out the front door. However, with regard to that evidence, Ryan was uncertain as to the source of his recollection and it was well within the province of the jury to determine the weight to be given that evidence. Appellant also points to Michelle's and her son's possible sighting of Cathy on December 7th. Nevertheless, the pair was not certain it was Cathy they saw. The amount of credibility to be given that testimony was likewise well within the jury's discretion.

11

Additionally, appellant's contention that Cathy had disappeared on previous occasions without taking the children is not supported by the record. The testimony in that regard is from Cathy's mother, who averred that when Cathy left, she always took the children with her, and the only time she left them with appellant was when she took business trips.

The gist of appellant's factual sufficiency argument is directed at the jury's rejection of the proposition that Blane committed Cathy's murder. He acknowledges the holding in *Geesa v. State*, 820 S.W.2d 154, 155 (Tex.Crim.App. 1991) that the failure of the State to disprove a reasonable alternative hypothesis does not render the evidence legally insufficient. However, he notes and cites the holding in *Richardson v. State*, 973 S.W.2d 384, 387 (Tex.App.--Dallas 1998, no pet.), that such alternative theories should be considered in reviewing the factual sufficiency of the evidence. *See also Cates v. State,* 72 S.W.3d 681, 689 (Tex.App.--Tyler 2001, pet. ref'd).

In supporting his proposition, appellant contends the conclusion that Blane was Cathy's murderer is as likely a conclusion as the one that appellant committed the murder. He bases this on Jones's inability to conclusively establish where he was the entire evening of Cathy's disappearance, as well as his hazy recollection of many events surrounding that disappearance. We disagree. Unlike Cathy's relationship with appellant, Jones had not threatened to kill Cathy, she was not seeking a divorce from Jones, and she had not argued with Jones the day of her disappearance.

12

Viewing all of the evidence in the light by which we must view it, we cannot say the jury's verdict was so contrary to the weight of the evidence as to be clearly wrong and manifestly unjust.  Appellant's second point is overruled.

In summary, both of appellant's points are overruled, and the judgment of the trial court is affirmed.


John T. Boyd
Senior Justice

Publish.

13