NO. 07-06-0017-CV



IN THE COURT OF APPEALS



FOR THE SEVENTH DISTRICT OF TEXAS



AT AMARILLO



PANEL A



JANUARY 25, 2006



______________________________




IN RE JOHANSON LEE WATSON, RELATOR






_______________________________


 


Before REAVIS and CAMPBELL and HANCOCK, JJ.

MEMORANDUM OPINION


 Relator Johanson Lee Watson, an indigent inmate, seeks a writ of mandamus to
compel the Honorable Tom Neely to consider and rule on certain motions. Presenting four
issues, relator maintains he is entitled to mandamus relief. For the reasons expressed
herein, we must deny the request for a writ. 

 Pursuant to a plea of guilty, in 1997, appellant was convicted of sexual assault in
the 46th District Court of Wilbarger County. In 2001, the convicting court denied relator's
motion for DNA testing reciting that "no evidence containing biological material has been
preserved, and that identity was not and is not an issue in this case." The trial court's
ruling was affirmed by this Court in Watson v. State, 96 S.W.3d 497 (Tex.App.-Amarillo
2002, pet. ref'd). In May 2003, pursuant to relator's inquiry, the Texas Department of
Public Safety notified him that evidence samples used in his case were still being
preserved in the Department's laboratory. 

 Relator must satisfy three requirements to establish his entitlement to the issuance
of a writ of mandamus, to-wit: (1) a legal duty to perform; (2) a demand for performance;
and (3) a refusal to act. Stoner v. Massey, 586 S.W.2d 843, 846 (Tex. 1979). When a
motion is properly filed and pending before a trial court, the act of considering and ruling
upon the motion is a ministerial act. Eli Lilly and Co. v. Marshall, 829 S.W.2d 157, 158
(Tex. 1992). However, the trial court has a reasonable time within which to perform that
ministerial duty. Safety-Kleen Corp. v. Garcia, 945 S.W.2d 268, 269 (Tex.App.-San
Antonio 1997, orig. proceeding). Whether a reasonable period of time has lapsed is
dependent on the circumstances of each case. Barnes v. State, 832 S.W.2d 424, 426,
(Tex.App.-Houston [1st Dist.] 1992, orig. proceeding). Other factors are influential such
as the trial court's actual knowledge of the motion, its overt refusal to act, the state of its
docket, and other judicial and administrative duties which must be addressed. In re
Villarreal, 96 S.W.3d 708, 711 (Tex.App.-Amarillo 2003, orig. proceeding). Further, the
party requesting relief must provide a sufficient record to establish his entitlement to
mandamus relief. Walker v. Packer, 827 S.W.2d 833, 837 (Tex. 1992). See also In re
Bates, 65 S.W.3d 133, 135 (Tex.App.-Amarillo 2001, orig. proceeding); In re Villarreal, 96
S.W.3d at 710 n.2 (filing something with the district clerk does not demonstrate that a
motion has been brought to the trial court's attention). 

 Several copies of documents presumably filed in the convicting court accompany
relator's petition for writ of mandamus. On August 29, 2005, he filed a motion in the
convicting court requesting appointment of counsel to pursue a motion for DNA testing
pursuant to article 11.07, section four of the Texas Code of Criminal Procedure. A motion
for leave to subpoena or call potential witnesses was filed on September 12, 2005, and on
September 19, 2005, he filed a motion for leave for supplemental [sic] and exhibits. 

 According to copies of three letters dated October 5, November 1, and December
19, 2005, relator corresponded with the Wilbarger County District Clerk inquiring on the
disposition of his motions. A copy of the District Clerk's response to relator's October 5th
inquiry indicates his request was forwarded to his attorney, Earl Griffin. The limited record
before us also contains a file-stamped motion dated November 29, 2005, for leave to
compel the District Judge of Wilbarger County to act on relator's petition for writ of habeas
corpus. Nothing in the scant record demonstrates presentation of the motions to the trial
court and a refusal to act. We conclude relator has not satisfied the burden to show his
entitlement to mandamus relief. See Walker, 827 S.W.2d at 837.

 Accordingly, relator's petition for writ of mandamus is denied.

 Don H. Reavis

 Justice



d to Cecil's vehicle. The officer
found a set of keys to Cathy's car on the front passenger side of Cecil's vehicle. 

 Jackie Bolden (Jackie) testified that she was Cathy's mother and lived several
houses down on the same street where appellant and Cathy lived. She visited her
daughter some three to five times a week. She said that Cathy's and appellant's marriage 
had been a troubled one. Indeed, Cathy had filed for divorce twice and had separated
from appellant several times.

 Jackie last saw Cathy on December 2 at Cathy's office. The first time she learned
of Cathy's disappearance was on December 8, when appellant called her and inquired if
she knew of Cathy's whereabouts. On the night of Cathy's disappearance, appellant told
her Cathy had come home and, although he wanted to discuss their divorce, she did not
want to do so because the children were present. Further, he said, Cathy went into their
bedroom, summoned him, and the pair had "massive sex." Jackie suspected appellant
was responsible for Cathy's disappearance and told the lead investigator so.

 The night that Cathy's automobile was found, Jackie went to the scene and noted
that when the police asked if anything had been removed from Cathy's car, both appellant
and Cecil denied that had occurred. An overnight bag was found in Cathy's car. The
contents of that bag led Jackie to believe that Cathy's disappearance was not voluntary.
This was true, she concluded, because although Cathy was a stylish dresser, the clothing
in the overnight bag was striped and plaid summer wear, which would clash, and they were
not suitable for December. Additionally, the bag contained hair rollers but no pins to use
with them, and there was no make-up or a make-up mirror. Jackie also felt that Cathy
would not have separated from appellant without taking the children with her. In the past,
when Cathy left appellant, she had always called Jackie to tell her where she was staying. 

 Marita Coke, who was the receptionist for the attorney Cathy had retained to bring
her divorce against appellant, testified that on December 6, she received a telephone call
from a man who represented himself to be appellant. He inquired if Cathy had filed for a
divorce. After getting her employer's permission to do so, she informed him that divorce
proceedings had been instituted. 

 Dr. Sparks Veasey, a pathologist, performed an autopsy on Cathy's body on April
6, 1995. He opined that the cause of her death was strangulation. 

 Randy Jordan, who had been confined with appellant at the Potter County Detention
Unit, testified that one day after speaking on the telephone appellant became visibly upset, 
remarked to him that the police had talked to his children, and said "I think they know I did
it." Carey Britt also testified that he met appellant when both of them were in treatment at
the PARC, and he heard appellant call Cathy "bitch" in telephone conversations with her. 
In one such conversation, he heard appellant tell Cathy he would kill her if she did not let
him see the children. 

 Blane Jones averred that he met Cathy in early November 1994 at a church
fellowship. They went to dinner the first night of their acquaintanceship, and their
relationship progressed from there into intimacy. Cathy told Blane she was separated and
was going through a divorce. Later in November, appellant called Blane and told him that
Cathy was still married to him, although his tone of voice was not hostile. Apparently the
couple continued their relationship, and Blane was with Cathy at her office on the afternoon
of December 6. She left to pick up one of her children and, while doing so, dropped Blane
off at his home. He understood that Cathy would stay that night with either one of her
sisters, at a motel, or with him. He was certain that she did not intend to stay at her house. 
When he did not hear from Cathy, he had two of his friends telephone Cathy's residence
in an attempt to reach her, but they were unable to do so. On December 7, appellant went
to see Blane where he worked as a security guard and inquired about Blane's relationship
with Cathy in a somewhat friendly manner. Appellant's conversations with him continued
until the police found Cathy's automobile. Blane acknowledged that at one time he had
been a suspect in Cathy's disappearance, but he was never arrested.

 Gladys Jean Blevins (Jean) testified that she had become a friend of appellant when
both were employed at Burger King in Amarillo. In November 1994, appellant telephoned
her and told her that Cathy had filed for divorce and would not let him come home. In the
course of that conversation, appellant said that if Cathy would not let him see his children,
he would kill her.

 Jarrod Barnum, one of the couple's children, who was 11 at the time of Cathy's
disappearance, said that Cathy picked him up at school on December 6. On the way
home, Cathy told Jarrod she was going to spend the night at a motel. She was going to
simply drop Jarrod off at the house, but he persuaded her to come inside. After she
entered the house, she went into the kitchen and argued with appellant for a few minutes. 
Jarrod said he thought they resolved whatever dispute they had, and that Cathy, or both
of them, (3) went into the bathroom of the master bedroom where they remained for 30
minutes to an hour. Jarrod next peered through the not-quite closed door of the master
bedroom and saw appellant at the sink washing his face. In his 1995 statement, Jarrod
said he also saw Cathy in bed with the covers up to her chin, but at the second trial, he had
no recollection of seeing her that way, but it would have been consistent with her nature
as she chilled easily.

 Brad Barnum, the couple's youngest son, who was about seven years old in
December 1994, recalled that he could not use one bathroom because Cathy was taking
a bath as she sometimes did when she returned from work. Although appellant took the
boys out to eat that night, Cathy did not go, he said, because she was taking a bath. 
However, the prosecution pointed out that in his 1995 statement, Brad had said that the
only reason he knew that she was taking a bath at the time was because appellant had told
him so. When appellant and the boys returned from their meal, Brad said he saw Cathy
with the covers pulled up to her chin. He said her lips appeared to be purple and she
appeared to be sleeping. He did not go into the room because appellant told them Cathy
was sleeping. He opined that everyone's lips might appear to be purple. Appellant and
the boys spent the remainder of the evening watching a movie on television. Brad fell
asleep before the movie concluded. He slept part of the time on the living room floor and
then lay on the sofa next to appellant. When he awoke the next morning, Cathy was gone.

 Ryan, the couple's son who was eight in 1994, testified that he walked through
Cathy's room to use the master bath and saw her in bed with the covers pulled up to her
chin. He also recalled that appellant and the boys fell asleep watching television and that
during the night, someone walked across the entryway tile and left through the front door. 
He thought it was Cathy, but admitted he was not sure whether his recollection was of an
actual event or part of a dream. He knew Cathy never came out of the bedroom while the
boys and appellant ate or watched the movie. In 1995, Ryan gave a statement in which
he said that appellant took the children into the bedroom to see that their mother was
asleep after he told them to be quiet but, at the second trial, Ryan had no memory of that
event. 

 Michelle Norman (Michelle) lived across the street from appellant and Cathy. While
she socialized with both of them, appellant was a closer friend. About two weeks before
appellant was released from the PARC, appellant called her and asked if Cathy was seeing
another man. Michelle told appellant about Blane and gave a general description of him. 
On December 6, Michelle saw Cathy arrive home with Jarrod about 4:00 p.m., shortly after
appellant had arrived. About 7:00 p.m., appellant phoned her and told her that Cathy was
napping, which she thought was somewhat odd because their telephone conversations
usually had some point, such as borrowing something or just to chat. The next morning
as Michelle was driving her son to school, they thought Cathy drove by. When Michelle
returned home, appellant called and asked if she had seen Cathy leave. She told him
about the believed sighting of Cathy shortly before the call. About an hour later, appellant
came to Michelle's house and told her that he and Cathy had "wild sex" the evening before
and afterward, she took a nap. The next morning, appellant came by again, told her Ryan
thought he saw Cathy leave through the front door, initially wondered why she would do
that, and then advanced an explanation for that conduct to fit his account of the evening's
activities. He also told her about a conversation in which Blane accused him of choking
Cathy to death and leaving her body in a field. Appellant additionally referred to the earlier
conversation in which Michelle thought she had seen Cathy and remarked to her, "You're
my witness."

 Cecil testified about the circumstances in which he discovered what he thought was
Cathy's car. He called appellant and picked him up to bring him to where the car was
located. As they approached the car, appellant got out of Cecil's vehicle before it came
to a full stop and entered the car through the passenger side. The police were notified
and, upon their arrival, obtained Cecil's permission to search his truck. When they did so,
to Cecil's surprise, they discovered a set of keys to Cathy's car. 

Legal Sufficiency

 Appellant's first challenge is to the legal sufficiency of the evidence. The standard
for measuring the legal sufficiency of the evidence is whether, after viewing the evidence
in the light most favorable to the prosecution, any rational trier of fact would have found the
essential elements of the offense beyond a reasonable doubt. Jackson v. Virginia, 443
U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). We measure the sufficiency of the
evidence by the elements of the offense as defined in a hypothetically correct jury charge. 
Malik v. State, 953 S.W.2d 234, 240 (Tex.Crim.App. 1997). Parenthetically, appellant does
not challenge the adequacy of the court's charge.

 In making our determination, we consider all of the evidence in a light most
favorable to the jury's verdict. Johnson v. State, 871 S.W.2d 183, 186 (Tex.Crim.App.
1993), cert. denied, 511 U.S. 1046, 114 S.Ct. 1579, 128 L.Ed.2d 222 (1994). In this
matter, the State's case is based upon circumstantial evidence. Even so, it is well
established that the same review standard is applicable to cases based upon direct or
circumstantial evidence. Houston v. State, 663 S.W.2d 455, 456 (Tex.Crim.App. 1984).

 We are convinced that even without the inadmissible hearsay that led to the reversal
of the prior conviction, (4) the circumstantial evidence was sufficient to justify a reasonable
jury in believing beyond a reasonable doubt that appellant caused Cathy's death. The
evidence supporting the jury's verdict included, but was not limited to, the couple's history
of domestic problems, appellant's knowledge of her involvement with another man, her
efforts to obtain a divorce, and appellant's threats, albeit conditional, against Cathy's life. 
Additionally, the jury could reasonably infer from the overnight bag, packed with incomplete
items and inappropriate clothing found in Cathy's car was packed by someone, namely
appellant, who had access to her personal belongings, but was not familiar with a woman's
travel needs. Accordingly, appellant's first point is overruled.


Factual Sufficiency

 In his second point, appellant challenges the factual sufficiency of the evidence. In
conducting our factual sufficiency review, we are to review all of the evidence neutrally. 
Clewis v. State, 922 S.W.2d 126, 129 (Tex.Crim.App. 1996). Reversal is only required if
the evidence of guilt is so obviously weak as to undermine confidence in the jury's
determination or the proof of guilt is so contrary to the overwhelming weight of the evidence
as to be clearly wrong and unjust. King v. State, 29 S.W.3d 556, 563 (Tex.Crim.App.
2000). In our review, we must give appropriate deference to the jury's findings so as not
to substitute our judgment for that of the jury. Clewis, 922 S.W.2d at 135.

 In advancing his factual insufficiency claim, appellant points to several items of
evidence which he says controvert the jury's verdict. Included in those items is the fact that
in their investigation of Cathy's disappearance, the police did not see any scratches or
marks on appellant's face that might have been inflicted if there had been a struggle while
strangling her. He also cites evidence that on the night Cathy disappeared, appellant slept
with his children on the couch, but none of them recalled him getting up in the night. 
Further, Ryan recalled Cathy walking out the front door. However, with regard to that
evidence, Ryan was uncertain as to the source of his recollection and it was well within the
province of the jury to determine the weight to be given that evidence. Appellant also
points to Michelle's and her son's possible sighting of Cathy on December 7th. 
Nevertheless, the pair was not certain it was Cathy they saw. The amount of credibility to
be given that testimony was likewise well within the jury's discretion.

 Additionally, appellant's contention that Cathy had disappeared on previous
occasions without taking the children is not supported by the record. The testimony in that
regard is from Cathy's mother, who averred that when Cathy left, she always took the
children with her, and the only time she left them with appellant was when she took
business trips. 

 The gist of appellant's factual sufficiency argument is directed at the jury's rejection
of the proposition that Blane committed Cathy's murder. He acknowledges the holding in
Geesa v. State, 820 S.W.2d 154, 155 (Tex.Crim.App. 1991) that the failure of the State to
disprove a reasonable alternative hypothesis does not render the evidence legally
insufficient. However, he notes and cites the holding in Richardson v. State, 973 S.W.2d
384, 387 (Tex.App.--Dallas 1998, no pet.), that such alternative theories should be
considered in reviewing the factual sufficiency of the evidence. See also Cates v. State,
72 S.W.3d 681, 689 (Tex.App.--Tyler 2001, pet. ref'd).

 In supporting his proposition, appellant contends the conclusion that Blane was
Cathy's murderer is as likely a conclusion as the one that appellant committed the murder. 
He bases this on Jones's inability to conclusively establish where he was the entire evening
of Cathy's disappearance, as well as his hazy recollection of many events surrounding that
disappearance. We disagree. Unlike Cathy's relationship with appellant, Jones had not
threatened to kill Cathy, she was not seeking a divorce from Jones, and she had not
argued with Jones the day of her disappearance.

 Viewing all of the evidence in the light by which we must view it, we cannot say the
jury's verdict was so contrary to the weight of the evidence as to be clearly wrong and
manifestly unjust. Appellant's second point is overruled.

 In summary, both of appellant's points are overruled, and the judgment of the trial
court is affirmed.


 John T. Boyd

 Senior Justice


Publish. 
1. John T. Boyd, Chief Justice (Ret.), Seventh Court of Appeals, sitting by assignment. 
Tex. Gov't Code Ann. §75.002(a)(1) (Vernon Supp. 2003). 
2. All later references to months will be to those in 1994, unless otherwise specifically
identified. 
3. In his 1995 statement to the police, he said both of his parents went into the
bathroom.
4. Barnum v. State, 7 S.W.3d 782, 788-89 (Tex. App.-Amarillo 1999, pet. ref'd).