**Affirmed and Opinion Filed July 3, 2014**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-13-00334-CR

### JASON WALLACE CARPENTER, Appellant
### V.
### STATE OF TEXAS, Appellee

**On Appeal from the 397th Judicial District Court**
**Grayson County, Texas**
**Trial Court Cause No. 061997**

## MEMORANDUM OPINION

Before Justices Bridges, Francis, and Lang-Miers
Opinion by Justice Francis

After a jury convicted Jason Wallace Carpenter of burglary of a habitation and burglary of a building, the trial court assessed enhanced sentences of fifty years and ten years in prison, respectively. In three issues, appellant challenges the legal sufficiency of the evidence to support his convictions and the trial court's denial of his request for jury instructions on criminal trespass. We affirm.

Michael Curtis is the caretaker of a 109-acre ranch owned by Barry Davis. The property, including a house and a barn, is located on Liberty Road in Grayson County. On February 6, 2012, Curtis checked the property and found the gate unlocked, the house ransacked, and the barn broken into. Curtis contacted Davis and the Grayson County Sheriff's Office. Davis inspected the property and determined that various items were missing from both the house and

barn. Among other things, three flat screen televisions and various weapons were missing from the house. Missing from the barn or area around the barn were a 1988 two-toned Chevrolet Blazer, a Kubota 54-horsepower tractor with a front-end loader, a Kubota zero-turn mower, a golf cart, a dual axle trailer, chain saws, and miscellaneous tools. In addition, two 60-inch cast iron and bronze statues were missing from the swimming pool area. Weeks later, Davis realized a Brookstone dartboard set was also missing.

The next day, a deputy was patrolling the area of Liberty Road near the Davis property and noticed a fence down. The deputy investigated further but saw no criminal activity. He reported the downed fence to the property owner, Matthew Hogan. Hogan inspected his property and discovered Davis's tractor in a heavily wooded area. It appeared the tractor had been left running, hit a big tree, and then "climbed" the tree. Tracks in the area went "all the way back" to the Davis barn, passing a deer feeder along the way. A game camera that was hidden in the area of deer feeder was missing, leading Davis and investigators to believe the culprits were familiar with the property.

A couple of days after the burglary, an acquaintance of Davis's told him about a suspicious incident that may have been connected with the burglary. According to Don McFarlin, he was coming back from lunch on Liberty Road when he saw a two-toned Chevrolet truck coming down Davis's driveway and the gate was closed. The truck was occupied by two white males. McFarlin thought it "kind of looked funny" and then he "got a little bit further" and saw a red car being driven "super slow" by a blonde-haired woman. McFarlin said the woman was looking out one way and then his way "at the same time." He said he was surprised she was driving as slow as she was "on a road like that[.]"

Lt. Harvey Smitherman was the lead investigator on the case. Ultimately, he identified five suspects—appellant and four others, Clinton Curtis, his then-girlfriend Tara Mitchell, David

Phares, and Tara Wood. All were charged in the Davis burglaries, except Mitchell. The four testified against appellant, and their testimony provided the bulk of the State's case. All of them had prior criminal histories, including drug offenses, and had charges pending or had cases disposed of before testifying. Clinton had pleaded guilty to the Davis burglaries and was serving a fifteen-year sentence; two unrelated burglaries charges were pending. Wood and Phares were both awaiting trial on charges connected with the Davis burglaries. Wood had been continued on probation for a previous conviction, and as a condition of probation, had agreed to testify in this case. Phares said he was hoping for a more lenient sentence by testifying. Finally, Mitchell pleaded guilty to possession of methamphetamine and, as a condition of probation, agreed to cooperate and testify in these cases. The jury charge instructed that Curtis, Phares, and Wood were accomplices as a matter of law while the jury was instructed to determine whether Mitchell was an accomplice as a matter of fact.

The accomplices' testimony showed the following. The burglaries were set up by Clinton Curtis, who was the son of Davis's caretaker. Clinton testified he had known Davis since 2001, had been deer hunting with him, and had worked on his property. He began stealing things from Davis, like wine or gasoline. At one point, he took a dartboard and gave it to appellant. Appellant wanted to know where Clinton was getting "some of these nice things," and offered to pay him $200 and give him methamphetamine if he would show him the property. Clinton agreed.

At about 4:30 a.m. on the day before the burglaries, appellant, Clinton, Wood, and Mitchell went to the Davis property on a "scouting mission." Clinton unlocked the gate, and the group went to the barn to see what "kind of valuables" were there. Nobody went into the house.

Around noon the next day, appellant, Wood, and Phares returned to the Davis property and looked around. Appellant had brought in Phares and told him the Davis property was a

"pretty nice place" and there was a "bunch of stuff out there." While there, they found the "key box." They left to see if any "alarms went off" and returned an hour later.

Wood was driving Phares's red car. She dropped appellant and Phares off on the road and then parked across the street where she acted as a lookout. Wood said appellant and Phares returned about an hour later driving an older model two-tone Blazer with a trailer attached. Wood said there was a "bunch of stuff" in the back of the truck and a lawn mower on the trailer. According to Wood, she followed appellant and Phares to a wooded area off of Rock Creek Road, where they "stashed" the Blazer and trailer. The three then returned to her house in the car.

Phares testified that after Wood dropped them off, he and appellant walked through the woods to the Davis house. Phares said they had the key to the house and went in and "pretty much took everything out." Phares said they loaded the items in a Blazer they found in the barn and drove out the front gate, where Wood was waiting. They hid the truck in the woods, and then Phares and appellant went back to the Davis property without Wood. During this trip, they used the tractor to load up two statues by the pool. Afterwards, Phares said he "jumped off" the tractor while it was running and "let it go." Phares said they hid all the property taken in the woods.

Other accomplice testimony showed that Mitchell was the mother of Clinton's child and she had also had a relationship with appellant. Wood had also been in relationships with Clinton and appellant. Both Mitchell and Wood testified that Clinton did not like appellant and had threatened to "get" him. Mitchell also testified she was doing "a lot" of drugs during the time frame of the burglaries, which affected her memory.

In addition to the accomplices' testimony, the State also presented the testimony of Brandon Chaney, who was serving a prison sentence for unlawful possession of a firearm and

–4–

deadly conduct. Chaney testified that in March 2012, appellant came to see him and asked for help getting his truck unstuck. Appellant took him to a wooded area at Liberty and Rock Creek roads where he saw a Blazer with a trailer. A zero-turn mower and a golf cart were on the trailer. While Chaney worked to get the Blazer unstuck, appellant unloaded the trailer. Chaney said appellant told him he and Phares had taken the property from the house on Liberty Road. In exchange for helping him with the Blazer, Chaney said appellant gave him a 30-30 Winchester. (A 30-30 Winchester rifle was stolen from Davis's house.) Chaney also acknowledged that on the day following the burglary, he and appellant "scrapped" 213 pounds of yellow brass. Although the records showed Chaney scrapped the brass, Chaney testified it belonged to appellant. According to Chaney, the business required a driver's license and appellant did not have his with him.

In mid-April, officers from various law enforcement agencies went to appellant's residence and obtained consent to search the property. The dartboard set belonging to Davis was found in a shop on the property. Later that month, Smitherman was contacted by Chaney, who was worried that a warrant had been issued for his arrest on an unrelated incident. Chaney told Smitherman what he knew about the Davis burglaries and led deputies to the area where he helped appellant get the Blazer unstuck. Davis's golf cart, which was taken in the burglary, was still there. About 100 yards away, deputies found the registration papers to Davis's Blazer. A few days later, law enforcement officers went to Phares's residence, where they found a compound bow that belonged to Davis in a shed on the property. The tractor, bow, dartboard, and golf cart were the only stolen property recovered. Pieces of the stolen statues were found in a creek bed in Oklahoma.

In his first and second issues, appellant challenges the sufficiency of the evidence to support his convictions because (1) the evidence did not establish that he entered the house or barn and (2) the accomplices' testimony was not corroborated.

To obtain convictions of the offenses charged, the State had to prove appellant, without Davis's consent, entered both the house and barn with the intent to commit theft. *See* TEX. PENAL CODE ANN. § 30.02(a)(1) (West 2011). In reviewing a challenge to the sufficiency of the evidence, we examine the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). As fact finder, the jury is the sole judge of the witnesses' credibility and the weight to be given their testimony and is free to accept or reject any and all evidence presented by either side. *Wesbrook v. State*, 29 S.W.3d 103, 111 (Tex. Crim. App. 2000). Reasonable inferences may be drawn from the evidence presented at trial, and circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor. *See Hooper v. State*, 214 S.W.3d 9, 14 (Tex. Crim. App. 2007). Every fact need not point directly and independently to the defendant's guilt; rather, it is enough if the conclusion is warranted by the combined and cumulative force of all the incriminating circumstances. *Johnson v. State*, 871 S.W.2d 183, 186 (Tex. Crim. App. 1993).

A challenge of insufficient corroboration is not the same as a challenge of insufficient evidence to support the verdict as a whole. *Cantelon v. State*, 85 S.W.3d 457, 460 (Tex. App.—Austin 2002, no pet.). To corroborate accomplice-witness testimony, "[a]ll the law requires is that there be *some* non-accomplice evidence which *tends* to connect the accused to the commission of the offense." *Id*.; *see* TEX. CODE CRIM. PROC. ANN. art. 38.14 (West 2005). Corroboration is not sufficient if it merely shows the offense was committed. TEX. CODE CRIM. PROC. ANN. art. 38.14. To determine the sufficiency of the corroboration, we eliminate all of the

accomplice testimony from consideration and then examine the remaining portions of the record to see if there is any evidence that tends to connect the accused with the commission of the offense. *Castillo v. State*, 221 S.W.3d 689, 691 (Tex. Crim. App. 2007).

The corroborating evidence need not be sufficient by itself to establish guilt. *Id*. It may confirm a "mere detail" rather than the elements of the offense. *Lee v. State*, 29 S.W.3d 570, 577 (Tex. App.—Dallas 2000, no pet.). Even "apparently insignificant incriminating circumstances" may provide sufficient corroboration. *Trevino v. State*, 991 S.W.2d 849, 852 (Tex. Crim. App. 1999). We look at the particular facts and circumstances of each case and consider the combined force of all the non-accomplice evidence that tends to connect the accused to the offense. *Smith v. State*, 332 S.W.3d 425, 442 (Tex. Crim. App. 2011). Judicial experience shows that no precise rule can be formulated as to the amount of the evidence that is required to corroborate the testimony of an accomplice. *Gill v. State*, 873 S.W.2d 45, 48 (Tex. Crim. App. 1994). But, the "tends to connect" standard is not a high threshold. *Cantelon*, 85 S.W.3d at 461.

We begin with appellant's second issue in which he argues the only evidence that he entered the house or barn on the Davis property came from accomplices whose testimony was uncorroborated. Having reviewed the record, we cannot agree.

Setting aside the testimony of Phares, Clinton Curtis, Wood, and Mitchell, the jury had other evidence tending to connect appellant to the crimes. We begin with Brandon Chaney, who testified appellant told him that he and Phares had taken "stuff" from the "house on Liberty Road." Chaney said appellant showed up one day asking for help to "get his new Blazer unstuck." Chaney agreed and went with appellant to an area at Liberty and Rock Creek roads. Chaney said they drove down an old driveway, and he saw a Blazer with a trailer behind it. A gold cart and zero turn mower were on the trailer. While Chaney worked to get the Blazer unstuck, he said appellant was unloading the trailer. Chaney said appellant gave him a 30-30

Winchester for helping him with the truck. Later, Chaney led deputies to the area, and the golf cart taken from Davis's barn was still there. Deputies also found the registration papers for Davis's stolen Blazer on the ground about 100 yards away.

In addition to this evidence, appellant was in possession of a dartboard taken from Davis's property. While the evidence does not show the dartboard was taken in the burglaries at issue here, it nevertheless provides an incriminating circumstance and corroborates Clinton's testimony as to how appellant became involved.

Finally, McFarlin testified he passed Davis's property after lunch in February 2012 and saw a two-toned Chevrolet truck coming down the driveway and the gates were closed. Two white males were in the truck. He also saw a red car, driven by a woman, going "real slow" on the roadway. McFarlin's testimony corroborated the testimony of both Phares and Wood that they went to the Davis property with appellant in a red car in the early afternoon. After Phares and appellant loaded up the Blazer, which was two-toned, they drove it out the front gate where Wood was waiting. We conclude the above evidence was sufficient to tend to connect appellant to the burglaries of Davis's house and barn.

Further, considering all of the evidence, we conclude it was sufficient to establish appellant's participation in the burglaries of Davis's house and barn. Phares, Wood, Mitchell, and Clinton all gave testimony that appellant was involved. Clinton, Wood, Mitchell, and appellant went to the Davis property to scope out the property. A couple of days later, appellant, Phares, and Wood returned. Appellant and Phares went onto the property while Wood acted as a lookout. Phares testified he and appellant went into the house and "pretty much took everything out" and loaded it up in Davis's Blazer, which they had taken from the barn. Phares said they drove the Blazer out the front gate and hid it in the woods. Appellant admitted his role in the burglaries to Chaney.

In challenging the legal sufficiency of the evidence, appellant argues the only evidence connecting him to the crimes is the inconsistent testimony of alleged accomplices, all of whom he argues sought to "sacrifice" him in exchange for "assistance from the State for their sentences, or as a way to settle their personal disputes" with him. In particular, he directs us to evidence contradicting portions of Phares's testimony, suggests the memories of both Wood and Mitchell were affected by their drug use at the time, and relies on evidence that Clinton was biased against appellant. Appellant's argument goes to the credibility of the witnesses presented by the State to prove its case. And while we do not dispute that the accomplice witnesses had reasons to testify for the State in these cases and that some of the witnesses previously had drug issues, whether they were credible or not was an issue solely within the province of the jury. We overrule the first and second issues.

In his third issue, appellant argues the trial court erred by denying his requested jury instruction on criminal trespass. Since appellant filed his brief, the Texas Court of Criminal Appeals has decided this issue contrary to appellant. *See State v. Meru*, 414 S.W.3d 159 (2013).

In *Meru,* the court held that, as a general rule, criminal trespass will not be a lesser-included offense of burglary of a habitation because trespass requires proof of greater intrusion than burglary. 414 S.W.3d at 163-64 & n.3. The court explained that entry under the criminal trespass statute requires "intrusion of the entire body," TEX. PENAL CODE ANN. § 30.05(b)(1) (West Supp. 2013), while entry under the burglary statute allows for a partial entry. *See* TEX. PENAL CODE ANN. § 30.02(b). However, if the indictment alleges the defendant "entered by intruding his entire body into the habitation," criminal trespass could be a lesser-included offense "since such a descriptive averment is identical to the entry element of criminal trespass." 414 S.W.3d at 164.

In these cases, neither count alleged appellant intruded his entire body into the habitation or building.  Consequently, the entry element of criminal trespass does not require the same or less proof than entry for burglary and there are no facts alleged in the indictment that would allow the entry element of criminal trespass to be deduced.  *See id.*  The trial court did not err in denying appellant's requested instruction.  We overrule the third issue.

We affirm the trial court's judgment.


Do Not Publish
TEX. R. APP. P. 47
130334F.U05

/Molly Francis/
MOLLY FRANCIS
JUSTICE



## Court of Appeals
## Fifth District of Texas at Dallas

**JUDGMENT**

JASON WALLACE CARPENTER,
Appellant

No. 05-13-00334-CR          V.

STATE OF TEXAS, Appellee

On Appeal from the 397th Judicial District
Court, Grayson County, Texas
Trial Court Cause No. 061997.
Opinion delivered by Justice Francis;
Justices Bridges and Lang-Miers
participating.

Based on the Court's opinion of this date, the judgments of the trial court are
**AFFIRMED**.

Judgment entered July 3, 2014